No. 15-14992-FF
_____

In the

# United States Court Of Appeals

For the

# Eleventh Circuit

_____

Advantor Systems Corporation,

*Plaintiff/Appellant*

vs.

DRS Technical Services, Inc.,

*Defendant/Appellee*

_____

On Appeal from the United States District Court
Middle District of Florida

_____

# Opening Brief of Appellant
# Advantor Systems Corporation

_____

Laurie Webb Daniel
Brandon Elledge
Min K. Cho
HOLLAND & KNIGHT LLP
1180 West Peachtree Street, Suite 1800
Atlanta, Georgia 30309
Tel:  404-817-8533
Fax:  404-881-0470

*Attorneys for Plaintiff-Appellant Advantor Systems Corporation*

*Advantor Systems Corporation v. DRS Technical Services, Inc.*, No. 15-14992

# CERTIFICATE OF INTERESTED PERSONS
# AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record for Plaintiff-Appellant Advantor Systems Corporation ("Advantor") submit the following Certificate of Interested Persons and Corporate Disclosure Statement pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rules 26.1-1 and 26.1-2 of the Rules of the United States Court of Appeals for the Eleventh Circuit:

1. Adler-Paindiris, Stephanie L. (counsel for Appellee)

2. Advantor Systems Corporation (Appellant)

3. Baker, David (United States Magistrate Judge)

4. Chiu, Alicia M. (counsel for Appellee)

5. Cho, Min (counsel for Appellant)

6. Daniel, Laurie Webb (counsel for Appellant)

7. DRS Technical Services, Inc. (Appellee)

8. DRS Technologies, Inc. (former-party defendant)

9. Elledge, Brandon (counsel for Appellant)

10. Finmeccanica, S.p.A. (publicly traded company on the Italian stock exchange that owns 10% or more of DRS Technologies, Inc.'s stock; ticker symbol: FNC.MI)

11. Holland & Knight LLP (counsel for Appellant)

12. Infrasafe, Inc. (parent company of Appellant)

C-1

*Advantor Systems Corporation v. DRS Technical Services, Inc.*, No. 15-14992

13.    Jackson Lewis P.C. (counsel for Appellee)

14.    Losey, Ralph (counsel for Appellee)

15.    Meccanica Holdings USA, Inc. (wholly owned subsidiary of

Finmeccanica, S.p.A., parent and holding company of DRS

Technologies, Inc. (former-party defendant))

16.    Millcarek, Lauren (counsel for Appellant)

17.    Udell, Collin O'Connor (counsel for Appellee)

18.    Presnell, Gregory (United States District Court Judge)

19.    Sbert, Nicole (counsel for Appellee)

20.    Van Oot, Martha (counsel for Appellee)

Respectfully submitted,

/s/ Laurie Webb Daniel
Laurie Webb Daniel
HOLLAND & KNIGHT LLP
One Atlantic Center, Suite 2000
1201 West Peachtree Street, N.E.
Atlanta, Georgia 30309-3400
(404) 817-8500
laurie.daniel@hklaw.com

*Attorneys for Plaintiff-Appellant*
*Advantor Systems Corporation*

C-2

# STATEMENT REGARDING ORAL ARGUMENT

This appeal addresses the wrongful conduct of Defendant/Appellee DRS Technical Services, Inc. ("DRS") in misappropriating the trade secrets of Plaintiff/Appellant Advantor Systems Corporation ("Advantor") – trade secrets that relate to the provision of "intrusion detection systems" to the Air Force. Advantor, trying to recoup the value of the business it had built up through years of private research and development, sued DRS for violating the Florida Uniform Trade Secrets Act, for tortious interference with its employees' confidentiality and non-compete agreements, and for breach of a non-disclosure agreement. Some of the facts are conceded while others are vigorously disputed. Yet, the district court granted DRS summary judgment on all counts despite Advantor's voluminous opposition. In an order that is cryptic on key points – such as the core trade secrets claim – it held that DRS' conduct is not actionable. It also held that, even if DRS' conduct was wrongful, Advantor can prove no compensable damage, which was the district court's overarching but flawed rationale for entering summary judgment and excluding Advantor's expert damages evidence.

Advantor submits that these and related rulings conflict with controlling law and the record in this case, and thus the Court would benefit from the opportunity to question both sides on their factual and legal positions.

i

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

TABLE OF AUTHORITIES ...................................................................................iv

STATEMENT OF JURISDICTION...................................................................... viii

STATEMENT OF THE ISSUES.............................................................................1

STATEMENT OF THE CASE.................................................................................2

SUMMARY OF THE ARGUMENT .....................................................................18

ARGUMENT AND CITATION OF AUTHORITIES...........................................25

I.  There is a Triable Issue as to Liability with Respect to Each Claim .................25

    A.  Advantor has shown that its proprietary data and information constitute trade secrets – even in the hands of the government – and that DRS misappropriated this valuable information.....................................................25

    B.  DRS' admissions show tortious interference with the confidentiality and non-compete provisions of Advantor's employee-contracts.................35

    C.  A jury question exists as to whether DRS breached its own contract with Advantor by recruiting Advantor's employees and usurping its data...........39

II.  The District Court Erred in Holding that Advantor Cannot Prove Damages ....44

    A. Advantor has a right to recover disgorgement damages................................45

    B. Lost profits also are an available remedy.......................................................48

    C. Ancillary state-court litigation expenses are compensable............................51

III.  State Procedural Law Does Not Apply to the Punitive Damages Claim..........54

CONCLUSION ......................................................................................................58

# TABLE OF AUTHORITIES

**Cases**                                                                 **Pages**

*Allegiance Healthcare Corp. v. Coleman*,
    232 F. Supp. 2d 1329 (S.D. Fla. 2002) ........................................................ 30

*All Pro Sports Camp, Inc. v. Walt Disney Co.*,
727 So. 2d 363 (Fla. Dist. Ct. App. 1999) ........................................................ 30

*Banks v. Mario Indus. of Va., Inc.*,
    650 S.E.2d 687, 691 (Va. 2007) ................................................................ 43

*Bauer v. BILIB, Inc.*,
    16 So. 3d 318, 319 (Fla. Dist. Ct. App. 2009)Dist. Ct. App. 1999) .............52, 54

*Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.*,
    139 F.3d 1396 ........................................................................................139

*City of Tallahassee v. Blankenship & Lee*,
    736 So. 2d 29 (Fla. Dist. Ct. App. 1999) ................................................... 53

*E. Qualcom Corp. v. Global Commerce Ctr. Ass'n, Inc.*,
    59 So. 3d 347 (Fla. Dist. Ct. App. 2011) ................................................... 49

*Fabkom, Inc. v. R.W. Smith & Assocs., Inc.*,
    Civ. No. 95–4552, 1996 WL 531873 (S.D.N.Y. Sept. 19, 1996) .................... 47

*Fidelity Interior Constr., Inc. v. S.E. Carpenters Reg'l Council of United Bhd. of Carpenters & Joiners of Am.*,
    675 F.3d 1250, 1265 (11th Cir. 2012) ............................................................52

*Gen. Clutch Corp. v. Lowry & CEMA Tech., Inc.*,
    10 F. Supp. 2d 124 (D. Conn. 1998) ..............................................................47

*Gen. Clutch Corp. v. Lowry & CEMA Tech., Inc.*,
    10 F. Supp. 2d 124 (D. Conn. 1998) ..............................................................47

*Gentry v. Haborage Cottages-Stuart, LLLP*,
654 F.3d 1247 (11th Cir. 2011) ....................................................................52

*G.M. Brod & Co., v. U.S. Home Corp.*,
759 F.2d 1526 (11th Cir. 1985) ..................................................................50

*Eden Hannon & Co. v. Sumitomo Trust & Banking Co.*,
914 F.2d 556 (4th Cir. 1990) ...............................................................24, 45, 46

*Haaf v. Flagler Constr. Equip., LLC*,
No. 10-62321-CIV, 2011 WL 187119 (S.D. Fla. May 16, 2011) ....................56

*Horowitz v. Laske*,
855 So. 2d 169 (Fla. Dist. Ct. App. 2003) .......................................................53

*Imaging Bus. Mach., LLC v. BancTec, Inc.*,
459 F.3d 1186 (11th Cir. 2006) ........................................................................52

*Injection Research Specialist, Inc. v. Polaris Indus., L.P.*,
168 F.3d 1320 (Fed. Cir. 1998) ........................................................................47

*Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc.*,
262 F.3d 1152 (11th Cir. 2001) .......................................................................35

*Johnson Enters. of Jacksonville, Inc. v. FLP Grp.*,
162 F.3d 1290 (11th Cir. 1998) .......................................................................53

*Jones v. UPS Ground Freight*,
683 F.3d 1283, 1292 (11th Cir. 2012)N ...........................................................15

*Kewanee Oil Co. v. Bicron Corp.*,
416 U.S. 470, 475 (1974) ................................................................................32

*Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*,
569 F.2d 286 (5th Cir. 1978) ..........................................................................30

*Menuel v. City of Atlanta*,
25 F.3d 990 (11th Cir. 1994) ...........................................................................18

iv

*Marlite, Inc. v. Eckenrod*, No. 09-22607-CIV,
     2011 WL 39130 (S.D. Fla. Jan. 5, 2011) ...........................................................18


*Pantages v. Cardinal Health 200, Inc.*,
     No. 5:08-cv-Oc-10GRJ, 2009 WL 1011048 (M.D. Fla. Apr. 15, 2009) .....56, 57

*Petters v. Williamson & Assocs., Inc.*,
     210 P.3d 1048 (Wash. Ct. App. 2009) ...............................................................47

*Preferred Sys. Solutions, Inc. v. GP Consulting,*
     *LLC*, 732 S.E.2d 676 (Va. 2012) .......................................................................39

*Reiterer v. Monteil*,
     98 So. 3d 586 (Fla. Dist. Ct. App.  2012) .........................................................53

*R.K. Chevrolet, Inc. v. Hayden*,
     480 S.E.2d 477 (Va. 1997) .................................................................................49

*Schwartz v. Bloch*,
     88 So. 3d 1068 (Fla. Dist. Ct. App. 2012) ..............................................24, 53

*Sensormatic Elecs. Corp. v. Tag Co. US, LLC*,
     632 F. Supp. 2d 1147 (S.D. Fla. 2008) ..............................................................45

*Soliday v. 7-Eleven, Inc.*, No. 2:09-cv-807-FtM-29SPC,
     2010 WL 4537903 (M.D. Fla. Nov. 3, 2010) ...................................................56

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
     282 U.S. 555, 563 (1931) ...................................................................................49

*Syncsort Inc. v. Innovative Routines, Int'l, Inc.*, No. 04-3623 (WHW),
     2011 WL 3651331 (D.N.J. Aug. 18, 2011) .......................................................32

*Telecom Tech. Servs. Inc. v. Rolm Co.*,
     388 F.3d 820, 832–33 (11th Cir. 2004) .............................................................35

*Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, LLC*,
     637 F.3d 604 (5th Cir. 2011) .............................................................................30

v

*United States v. Killough*,
    848 F.2d 1523, 1531 (11th Cir. 1988) ..........................................................49


*USM Corp. v. Marson Fastener Corp.*,
    467 N.E.2d 1271, 1276 (Mass. 1984) ..........................................................45

*Ward v. Estaliero Itajai S/A*,
    541 F. Supp. 2d 1344, 1359 (S.D. Fla. 2008) ..............................................56

*Wright v. Nigh*,
    399 So. 2d 515, 517 (Fla. Dist. Ct. App. 1981) ...........................................54

*Xtec, Inc. v. Cardsmart Techs., Inc.*, No. 11-22866,
    2014 WL 10268426 (S.D. Fla. May 15, 2014) ...........................................28

*Zibtulda, LLC v. Gwinnett Cnty. ex rel. Bd. of Comm'rs of Gwinnett Cnty.*,
    411 F.3d 1278 (11th Cir. 2005) ..................................................................18

## Statutes

Fla. Stat. § 542.331(1)(k) ....................................................................................54

Fla. Stat. § 688.002 ....................................................................................32, 34

Fla. Stat. § 688.004(1) ................................................................................24, 45

Fla. Stat. § 768.72 ...............................................................................................48

## Regulations

48 C.F.R. § 227.7102-4(a)(1) ....................................................................5, 27, 28

48 C.F.R. § 252.227-7015................................................................................27

48 C.F.R. §§ 27.402(b) ......................................................................................27

**Other Authorities**

Jeremy M. Colvin, *The Wrongful Act Doctrine: A Common Law*
    *Exception to the American Rule on Entitlement to Attorneys' Fees in Florida*,
    Fla. B.J., Dec. 2015 ............................................................................................35

12 Roger M. Milgrim & Eric E. Bensen,
    *Milgrim on Trade Secrets* § 7.02(2)(c) at 7-93 (2012) ......................................26

Ralph C. Nash & Leonard Rawicz, *Intellectual Property in*
    *Government Contracts*, ch.4 pmbl., § 1, at B.1–.2.a (2015) ..............................35

# STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a), as the parties are citizens of different states and the amount in controversy exceeds $75,000. This Court has appellate jurisdiction under 28 U.S.C. § 1291 because this appeal seeks review of a final judgment entered after the district court granted the defendant summary judgment, which disposed of all claims and issues in the case. The final judgment was entered on October 30, 2015 (Docket Entry ("Doc.") 180), and Advantor timely filed its notice of appeal on November 6, 2015 (Doc. 183).

# STATEMENT OF THE ISSUES

1.     Whether the district court erred by granting DRS summary judgment when record facts – some of which are conceded and others disputed – create a triable issue as to each cause of action by showing that: (a) Advantor's technical data and proprietary information constitute trade secrets – even in the hands of the government – which DRS misappropriated; (b) DRS tortiously interfered with the confidentiality and non-compete provisions of Advantor's employee-contracts; and (c) DRS breached its own non-disclosure agreement with Advantor by recruiting Advantor's employees and usurping Advantor's proprietary data.

2.     Whether the district court's alternative ground for summary judgment – that Advantor cannot show compensable damage from DRS' conduct – is erroneous because the evidence supports a recovery of: (a) disgorgement damages; (b) lost profits; and (c) Advantor's ancillary state-court litigation expenses.

3.     Whether the district court erred by applying state procedural law to restrict Advantor's ability to recover punitive damages in this action.

1

# STATEMENT OF THE CASE

### *Nature of the Case*

This is a government contractor dispute concerning security at no less than 19 Air Force bases.  As a result of spending years and valuable resources to develop a proprietary "intrusion detection system," Plaintiff/Appellant Advantor Systems Corporation ("Advantor") became one of only three providers approved by the Air Force to protect priority-level property through security, installation, maintenance, and training services. Indeed, the Air Force has acknowledged the proprietary nature of Advantor's manuals and other technical data, and did not even try to negotiate "data rights clauses" for Advantor's contracts as necessary to pass on Advantor's proprietary information to other Air Force providers.

It turns out, however, that a larger company had its eye on Advantor's IDS business – Defendant/Appellee DRS Technical Services, Inc. ("DRS"). Documents reveal that DRS devised a multi-pronged scheme to usurp Advantor's business by asking friends at the Air Force to give it Advantor's manuals – even though they were protected by confidential legends and trade secret acknowledgments – and by enticing Advantor employees to switch to DRS and disclose Advantor's valuable proprietary information in violation of their restrictive covenants and a non-disclosure agreement. These are just a few of the pertinent facts – some conceded, others disputed – regarding how DRS planned to and did in fact achieve its goal.

2

Seeking to prevent further harm and to recover the millions of dollars it lost as a result of DRS' conduct, Advantor sued DRS for injunctive and monetary relief plus punitive damages. Its operative complaint alleged: (1) violations of Florida's Uniform Trade Secrets Act ("FUTSA"); (2) common law tortious interference; and (3) breach of a non-disclosure agreement between Advantor and DRS. After extensive discovery, DRS moved for summary judgment, which the district court granted in short order despite Advantor's voluminous opposition, which pointed to material issues of fact as well as legal authorities supporting its position. For example, on the trade secrets claim, the district court found that "[i]t appears that Advantor's real issue in regard to the manuals and drawings is with the Air Force, not DRS[,]" and that Advantor cannot prove damages in any event under either a disgorgement or lost profits theory. Advantor submits, however, that these findings and the other rulings that underlie the summary judgment disregard black letter principles of government contracts and trade secrets law. Furthermore, Advantor contends that the district court erred in applying state procedural law to restrict its punitive damages claim in this federal case.

Accordingly, as discussed below, Advantor asks this Court to reverse the judgment below and remand for trial on all claims because there is a genuine issue of material fact as to each cause of action. Moreover, Advantor should be allowed to pursue its punitive damages claim unrestricted by state procedural law.

3

### Statement of Facts

***Advantor's proprietary intrusion detection system.***  After investing substantial resources to develop a state-of-the-art proprietary intrusion detection system ("IDS"), Advantor became one of only three approved IDS providers to protect priority-level resources on Air Force bases.  Docs. 125 at 2–3; 126-1 at 21–26, 69, 171.[1] The Air Force became Advantor's largest customer, having Advantor equipment installed on several of its bases, including the 19 at issue here. *Id.*

The proprietary equipment and services provided by Advantor include computer hardware and IDS products (also called annunciators); software to integrate with Advantor's and other manufacturers' hardware; and labor and training on installation and maintenance techniques that are unique to Advantor's systems. Docs. 125 at 2–4; 126-1 at 21–22.

The Air Force has acknowledged that Advantor's IDS manuals and training materials are proprietary in nature. Docs. 125 at 4; 126-4; 126-7; *see also* Joint Mot. to Seal Portion of R. at 6–14 (describing Advantor's technical data sought to be protected from disclosure in this appeal). Further, the government did not negotiate data rights clauses in its contracts with Advantor as necessary under

---

[1] Advantor's exhibits in response to the summary judgment motion are at Doc. 126 and, due to their volume, the CD noted at Doc. 127.  The parties have stipulated that this CD, along with the CD of documents noted at Doc. 138 that are the subject of the Joint Motion to Seal, are part of the record on appeal. *See* Doc. 196.

federal regulations to allow another government contractor to use such proprietary information. Docs. 127-39 at ¶¶ 3–4; 127-61 at 237–49; 181-28 at 77–78; 181-27 at 3–4; *see* Doc. 125 at 30–33; *see also* Defense Federal Acquisition Regulation Supplement ("DFARS"), 48 C.F.R. §§ 227.7102-4(a)(1), 252.227-7015. And Advantor would not have agreed to give away its data rights.  Doc. 127-39 at ¶ 3.

Indeed, Advantor goes to great lengths to protect this information. It limits the individuals it trains to its own employees, who enter into non-competition and confidentiality agreements; those government customers who assist in operating the IDS systems that Advantor designs and installs; and certified subcontractors, who must promise that their employees will maintain the confidentiality of Advantor's training information. *See* Docs. 125 at 3–4; 126-1 at 22–30; 126-2 at 46–47, 70–71, 75; 126-3; 126-4.

Advantor also requires all trainees, including government personnel, to acknowledge verbally and in writing the confidential nature of its IDS training and materials, including its IDS manuals. Docs. 125 at 3 & n.2; 126-3; 126-4; 126-2 at 75; 181-13 at 66–67.  And this "NOTICE" is given when they sign into each class:

> The information provided in this training class, which may be communicated in writing or verbally, is considered Proprietary and Confidential to Advantor.  These instructional manuals also contain trade secret information to Advantor.  This information may be used only for its intended purpose and may not be disclosed without the express written consent of Advantor Systems Corporation . . . .  The information disclosed by Advantor pursuant to this training is considered fully protected by 18 U.S.C. Section 1905….

5

Docs. 125 at 3 n.2; 126-4. Advantor's manuals also restrict disclosure, stating:

> This information is intended solely for the individual or entity to which it is addressed and may contain confidential and/or privileged material. Any review, transmission, dissemination or other use of or taking action in reliance upon this information by persons or entities other than the intended recipient is prohibited.

Docs. 125 at 3 n.3; 126-5.

Advantor keeps track of those who attend its training sessions. Docs. 181 at 11–12 & n.6; 181-13 at 30–31. Those who pass Advantor's training exams become certified to work on the Advantor IDS product that was the subject of the training. Docs. 125 at 3–4; 126-2 at 42. These certifications last up to two years but expire if the individual leaves his or her employment. *Id.*; *see* 126-1 at 39–40.

***DRS' design to usurp Advantor's business.*** Advantor dealt with the Air Force on this basis for over a decade up until 2013. Docs. 125 at 2–4; 126-1 at 69. In the summer of 2013, however, another government contractor – DRS – devised a plan to take over Advantor's business. At the time, DRS held an umbrella contract with a Navy entity known as the Space and Naval Warfare Systems Command ("SPAWAR"). Doc. 126-8 at 22; Ex. 9 at 26. And some of DRS' high-ranking employees had a longtime working and social relationship with the SPAWAR program manager. Doc. 126-8 at 179–81. So DRS authored and submitted to SPAWAR a "white paper" – written by DRS but from the perspective of SPAWAR – promoting the consolidation and administration of all IDS

6

maintenance work for the Air Force through this Navy entity. Docs. 125 at 5; 126-10 at 130–131, 238–239; 126-9 at 18–19; 138 (no. 29 listed in Joint Motion to Seal ("Seal Mot.")).

DRS' white paper was successful. Shortly after its submission, SPAWAR took over administration of the IDS contracts at a number of Air Force bases – including those with Advantor IDS equipment – and issued a request for quotation ("RFQ") for IDS services. Docs. 125 at 5; 126-10 at 130–31; 127-12.

DRS desperately wanted to win this SPAWAR contract, and admitted privately that it wanted to become "the ESS [electronic security systems] contractor of choice" for the Air Force in place of Advantor. Docs. 125 at 2, 9–10, 10 n.21; 126-33; 126-9 at 82–83, 160.  Furthermore, due to the existing umbrella contract between SPAWAR and DRS, DRS was eligible to bid but Advantor was not. Docs. 125 at 3–4, 4 n.4; 126-8 at 22–24. Thus, DRS was well-positioned to take over Advantor's business – except that DRS did not have personnel with the experience or requisite systems certifications needed for this work. The SPAWAR specifications required that the awardee have personnel certified to work on the applicable IDS products on the listed bases, which were either Advantor IDS products or those of another entity known as Vindicator:

> In addition, personnel performing annunciator maintenance shall have current A7S AEL approved annunciator certification for IDS components, including annunciator hardware and software used at the identified bases.

7

Docs. 125 at 6; 127-12 at 060010 ("Certification Requirement").

Government witnesses concede that this "AEL approved annunciator" language refers to Advantor as one of the only three AEL annunciator manufacturers. Doc. 127-15 at 129, 141. Advantor, of course, had the certified and experienced personnel but DRS did not. *See* Doc. 125 at 6–7.

***The DRS/Advantor non-disclosure agreement.*** Because DRS did not have the expertise or the certified personnel necessary to work on Advantor IDS equipment, DRS reached out to Advantor as a potential subcontractor on the SPAWAR project. Doc. 125 at 7. Purportedly to allow the parties to work together, DRS insisted that Advantor disclose competitive information to it, but also agreed to restrict the use of that information. Docs. 127-16; 126-1 at 79–80. And so, to gain this information, DRS signed a nondisclosure agreement ("NDA"), its own NDA form, which contained the following non-hire clause:

> [N]either Party shall knowingly or actively seek to hire any employee of the other Party. This restriction shall not prohibit either Party from hiring any person as a result of the use of an independent employment agency (so long as the agency was not directed by such party to solicit such person) or as the result of the use of a general solicitation (such as an advertisement) not specifically directed to employees of the other Party.

Docs. 82-1 at 5; 125 at 7. The NDA further restricted DRS' use of Advantor's proprietary information to "discussing" their potential collaboration on the SPAWAR project. Docs. 127-16 at ¶¶ 2, 4; 125 at 7.

Relying on the NDA, Advantor sent DRS by email – with a confidentiality notice – a tailored bid for the SPAWAR work, including pricing, past performance information, and a detailed staffing matrix. Docs. 125 at 9–10; 138 (nos. 11 and 18 in Seal Mot.).   DRS knew it was receiving this data pursuant to the NDA, and has admitted that the pricing data was proprietary. Doc. 126-10 at 71–72; *see also* Doc. 127-35 (stating that DRS was "dying" without it).

After reviewing Advantor's pricing, however, DRS concluded that it would "save about $500K" by cutting Advantor out of the deal. Docs. 125 at 9–11; 127-32; 126-9 at 73–75.  Then – using Advantor's pricing and past performance information without Advantor's consent – DRS crafted a low-price bid for the SPAWAR contract. *Id.* In fact, DRS copied virtually verbatim Advantor's past performance information and pasted it into its final SPAWAR bid.   Doc. 138 (*compare* p. 24774 at no. 18, *with* p. 910010-11 at no. 22 in Seal Mot.).

Indeed, even after deciding to "kill" the proposal of working with Advantor, Doc. 127-32, DRS traded on Advantor's IDS reputation with the Air Force in its September 12, 2013 proposal to SPAWAR by representing in its proposal that Advantor was DRS' "strategic partner," that Advantor was part of DRS' "team" that would help DRS perform the work, and that the Certification Requirement in the RFQ was "critical" to meet. *See* Docs. 125 at 10; 138 (no. 22 in Seal Mot.).

SPAWAR relied on these statements in DRS' proposal and viewed them as material. *Id.*; Docs. 126-8 at 204; 135-2 at 142–44.  Further, in September 2013, SPAWAR awarded DRS a one-year contract in the amount of $6.6 million for the provision of IDS services ("Year 1") – a contract that replaced Advantor with DRS at the 19 Air Force bases that Advantor previously served.  Docs. 125 at 11; 129-2. DRS, however, completely abandoned any pretense of involving Advantor in the work and decided, instead, to recruit Advantor employees to do the job.

***DRS' poaching of Advantor's employees.***  In October 2013, DRS announced to Advantor that it would "self-perform" on the SPAWAR contract by using recruited Advantor personnel. Docs. 125 at 11; 127-36; 126-1 at 156–57. And in October-November 2013, DRS hired away three Advantor employees to enable it to "self-perform" — Greg Larson, Axel Alvarez, and John Ellfeldt.  Docs. 125 at 8, 11; 127-36.  DRS considered these Advantor employees "key" and "critical" to DRS' ability to perform on Advantor's IDS equipment, and they were considered "A+" and "urgent" in the DRS job requisitions. Docs. 125 at 7–8, nn.15–16; *id.* at 23–24, n.51; 126-10 at 209:9–16; 127-26; 127-27.

DRS targeted these Advantor employees even though it knew they had non-compete and confidentiality agreements with Advantor. For example, Advantor's employee-contracts provided, *inter alia* that, within two years after leaving Advantor, the employee would not "directly or indirectly engage in any activity

10

competitive to Advantor … or in association with … any person, business or firm engaged in a similar business to Advantor's." Doc. 179 at 8. The employees also agreed not to "divulge or give to any other person or firm the benefit or advantage of Advantor's confidential business methods, forms knowledge, information and experience acquired by Employee while employed by Advantor." *Id.*

DRS not only has admitted knowing of these contracts, it even has acknowledged internally that DRS and Advantor are competitors – powerful evidence that it intentionally induced these employees to breach their contracts with Advantor. Docs. 125 at 11,  n.27; *id.* 25–26, nn.55–56; 127-13 at 156; 127-17 at 130–31; *see also* Doc. 179 at 9. Moreover, when recruiting Larson, DRS told him "not to worry" about his Advantor employee-contract and that DRS would "blow Advantor away." Docs. 125 at 11; 127-29 at 370–71; 127-37 ¶ 9.

In fact, DRS convinced Larson to breach his covenants with Advantor by disclosing important Advantor trade secrets to DRS both before and after Larson left Advantor. *Id*. After switching from Advantor to DRS, Larson continued to give DRS detailed information and recommendations related to "Advantor Concepts" and practices. Docs. 125 at 35–36, n.69; 138 (nos. 15–17 in Seal Mot.). DRS' program manager found this information helpful and directed Larson to pass on the information to other DRS technicians on the SPAWAR contract, which Larson did. Docs. 125 at 11–12, n.29;  127-45. Also, like Larson, the other recruited Advantor

11

employees disclosed Advantor's proprietary information to DRS. For example, Ellfeldt admitted sending Advantor training manuals to DRS. Docs. 127-41 at 3; 125 at 12, n.29.

As a result of DRS' actions, Advantor had to file separate lawsuits against Larson, Ellfeldt, and Alvarez to enforce its restrictive covenants and confidentiality requirements – at substantial out-of-pocket expense. Docs. 158 at 9; 129 at 18–20.

***DRS' receipt of Advantor's trade secrets from government contacts.*** DRS had difficulty performing at Advantor sites due to its lack of expertise with Advantor's IDS equipment. Doc. 126-6. And in January-February 2014, DRS obtained Advantor IDS manuals and an Advantor drawing from an Air Force contact, Sergeant Matthew Verner, to assist DRS in servicing Advantor equipment. Docs. 125 at 12–13; 127-43; 127-42; 127-13 at 165–71; 181-35 ¶ 16; 138 (no. 8 in Seal Mot.). Verner knew that Advantor's manuals constituted trade secrets because he acknowledged that fact when he received Advantor's training. Docs. 125 at 12–13; 181-17; 127-13 at 165–71; 127-47.

Knowing that Advantor's manuals were subject to restrictive legends and other protections, DRS internally discussed on February 10, 2014 "Dissemination Ideas" for these materials. Doc. 127-42. DRS then asked its SPAWAR customer to try to make the manuals "Government Furnished Information." *Id*; Doc. 127-46. Though the government had obtained these manuals from Advantor without any

12

right to distribute them to other contractors – and though the manuals themselves bore restrictive legends – the Advantor manuals were then disseminated into the field for DRS' technicians to use on the SPAWAR contract. Docs. 125 at 11–13; 127-13 at 165–71, 179; 126-11 at 105; *see* 126-38; 126-41; 126-42; 126-46. And DRS has admitted using Advantor's IDS manuals for its work on the SPAWAR contract. Docs. 127-13 at 170–71; 181-35 at ¶ 16.

***DRS' continuing misappropriation.***  In March 2014, DRS internally conceded that the "DRS hot button right now is the demise of Advantor."  Docs. 125 at 13–14, n.37; 127-50; 127-9 at 158–59. It also discussed "[h]ow much money will it take to knock Advantor out of the running in the future?" Docs. 125 at 13–14, n.37; 127-49; 126-9 at 153, 157. Then, when the SPAWAR contract came up for re-bid in September 2014, DRS was awarded the contract for another year ("Year 2"). Docs. 125 at 13, n.34; 127-39 ¶ 10. According to the SPAWAR program manager, DRS won the $7.5 million Year 2 contract based on its performance in Year 1 – a performance enabled by the former Advantor employees and Advantor's proprietary technical data and know-how. Docs. 125 at 13; 126-8 at 45–46, 139–41, 167-68, 211–12, 217–18; 127-11 at 152–153.

### Proceedings Below

Advantor filed suit against DRS in April 2014.  Advantor's operative complaint alleges that DRS (1) breached the NDA by usurping Advantor's

proprietary data to win the SPAWAR contract and recruiting Advantor employees

to enable it to "self-perform" rather than involve Advantor in the work as a

subcontractor (Count I); (2) tortiously interfered with the non-compete and

confidentiality provisions of Advantor's employee-contracts (Counts II-IV); and

(3) misappropriated Advantor's trade secrets in violation of Florida's Uniform

Trade Secrets Act (Count V). Doc. 82 at 16–22.

Advantor sought relief in the form of (1) lost profits; (2) unjust

enrichment/disgorgement damages; (3) litigation expenses incurred in ancillary

state-court litigation to enforce the restrictive covenants of the Advantor

employees recruited by DRS; (4) punitive damages; (5) attorneys' fees based on

DRS' malicious misappropriation; and (6) prejudgment interest. Doc. 158 at 8–9.

Advantor also asked for a permanent injunction.  Docs. 82 at 22; 158-9 at 3.

The parties engaged in extensive discovery, during which Advantor amassed

evidence to support each cause of action through DRS' admissions, documentary

evidence, and the testimony of government personnel. *Supra* at 4-3. Advantor also

compiled evidence on damages, including proof of lost profits based on its

historical performance of IDS services. And it had evidence on the issue of

disgorgement damages, including (but not limited to) the revenues that DRS

gained through its misappropriations – $6.6 million in Year 1 and $7.5 million in

Year 2 of the SPAWAR contract. Advantor was unable to show DRS' net profits

14

only because the district court denied its motions to compel DRS to produce financial documents. Docs. 79-80, 90. But that ruling does not impact Advantor's right to recover disgorgement damages because, under controlling law, it is DRS' burden to prove expenses once the amount of its ill-gotten revenue is known. *See infra* at 41. The denial of access to DRS' financial documents reflects legal error, however, as the ruling evidently is rooted in a state procedural law. *Infra* at 50–52.

Ultimately, the district court granted DRS summary judgment on all counts, even though Advantor had filed a voluminous opposition supported by depositions and exhibits and had submitted – through a *joint* motion to file under seal – a CD containing the claimed trade secrets. *See* Docs. 125 at 11, n.28; 130; 137 (ordering the documents filed "for chambers use only"); 179. The brevity of analysis in the summary judgment order is in stark contrast to the depth of the factual record and legal arguments presented by the parties. And the order reads almost as if the court were functioning as fact-finder.

Notably, the district court's discussion of the summary judgment standard omits the usual rule about "construing all facts and drawing all reasonable inferences in favor of the nonmoving party." *See* Doc. 179 at 3-4; *cf. Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012). A court "'may not weigh conflicting evidence or make credibility determinations of [its] own. If the record presents disputed issues of fact, the court may not decide them; rather, [it] must

15

deny the motion and proceed to trial." *Id.* (citations omitted). This principle, however, is not observed in the summary judgment order here.

For example, in rejecting the tortious interference claim as a matter of law, the district court found that the recruited Advantor employees – though "performing the same work on the same bases as they performed during their employment with [Advantor]" – were not "engag[ing] in any activity competitive to Advantor,'" – which the district court found was the only activity prohibited by the non-compete clause of the Advantor employee-contracts. Doc. 179 at 10-11. This finding, however, gives no weight to DRS' admission that DRS and Advantor were competitors. Doc. 125 at 25–26, nn.55–56. After all, DRS' "self-performance" using Advantor employees and manuals replaced Advantor's role – which is an act of direct competition. The order also unduly limits the scope of the non-compete clause, which barred former Advantor employees from associating in any capacity with a business "engaged in a similar business to Advantor's" and from divulging "to any other person or firm the benefit or advantage of Advantor's confidential business methods, forms knowledge, information and experience acquired by Employee while employed by Advantor." *See* Doc. 179 at 8, 11. Because the record shows that the Advantor employees recruited by DRS did just that, the district court violated the summary judgment standard when it found in DRS' favor on this issue.

16

Regarding the NDA, the district court found that the restrictions on DRS' use of the proprietary price quote that Advantor sent to DRS was not actionable because the "boilerplate confidentiality language" used by Advantor in its emails "is not enough to satisfy the identification/marking requirements of the NDA." Doc. 179 at 6. But the NDA does not impose such a rigid requirement for confidentiality notices, and DRS acknowledged receiving this information pursuant to the NDA. The district court's finding that the confidentiality notice was insufficient as a matter of law did not afford Advantor every reasonable inference from the record as required by the summary judgment standard.

Thus, it is apparent that the district court construed the evidence in favor of DRS and did not give Advantor the benefit of all reasonable inferences as required by the summary judgment standard. In fact, at the hearing, the district court directed disparaging remarks towards Advantor which suggest a pre-disposition in DRS' favor. It called Advantor's legal theories "bizarre" and its damage theories "absolutely ludicrous." Doc. 174 at 16, 39. It also suggested that Advantor and its counsel might be sanctioned under 28 U.S.C. § 1927 – which is not standard summary judgment practice and, Advantor submits, is not appropriate given the record in this case. *Id*. at 39.

### *Standard of Review*

The Court "review[s] a summary judgment *de novo*." *Zibtulda, LLC v. Gwinnett Cnty. ex rel. Bd. of Comm'rs of Gwinnett Cnty.*, 411 F.3d 1278, 1281 (11th Cir. 2005). "Summary judgment is appropriate when 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)). "In examining the record, [the Court] view[s] the evidence in the light most favorable to the non-moving party." *Id.*

Indeed, the *de novo* standard of review applies to the entire appeal because Advantor challenges only issues of law. "The concept of de novo review encompasses with respect to certain cases (including summary judgments) and certain issues (including all issues of law) the appellate judges' unquestioned entitlement to weigh the arguments advanced in the trial court without considering the component of presumptive correctness that often accompanies the trial court's judgment." *Menuel v. City of Atlanta*, 25 F.3d 990, 997 n.7 (11th Cir. 1994).

## SUMMARY OF ARGUMENT

*1. Nature of case.* This is a government contractor dispute concerning security at 19 Air Force bases. After spending its own resources to develop a proprietary "intrusion detection system" ("IDS"), Plaintiff/Appellant Advantor Systems Corporation ("Advantor") became one of only three providers approved

18

by the Air Force to protect priority-level property through security, installation, maintenance, and training services. The Air Force has agreed that Advantor's IDS products, associated technical data and manuals are proprietary. Further, it did not even try to negotiate "data rights clauses" for Advantor's contracts as necessary to pass on Advantor's proprietary information to other Air Force providers.

It turns out, however, that a larger company had its eye on Advantor's IDS business – Defendant/Appellee DRS Technical Services, Inc. ("DRS"). Documents reveal that DRS devised a multi-pronged scheme to usurp Advantor's business by asking a low-level contact at the Air Force to give it Advantor's manuals – even though they were protected by confidential legends and trade secret acknowledgments – and by enticing Advantor employees to switch to DRS and disclose Advantor's valuable proprietary information in violation of their restrictive covenants and a non-disclosure agreement. DRS also obtained confidential pricing and other proprietary information from Advantor pursuant to a nondisclosure agreement ("NDA") when discussing a proposal to partner on a new contract for IDS services, but then misappropriated that information to win and then "self-perform" under the contract after cutting Advantor out of the project – in violation of the NDA terms. These are just a few of the facts – some conceded, others disputed – regarding how DRS planned to and in fact achieved its goal to take over the IDS work that Advantor had performed for a decade at the 19 Air Force bases.

19

Seeking to prevent further harm and to recover the millions of dollars it lost as a result of DRS' conduct, Advantor sued DRS for injunctive and monetary relief plus punitive damages. Its complaint alleged: (1) violations of Florida's Uniform Trade Secrets Act ("FUTSA"); (2) common law tortious interference; and (3) breach of the NDA. And it sought relief in the form of (1) lost profits; (2) unjust enrichment/disgorgement damages; (3) litigation expenses incurred in ancillary state-court litigation to enforce the restrictive covenants of the Advantor employees recruited by DRS; (4) punitive damages; (5) attorneys' fees based on DRS' malicious misappropriation; and (6) prejudgment interest. Advantor also asked for a permanent injunction.

*2. The error.* After extensive discovery, DRS moved for summary judgment on all counts, which the district court granted in short order despite Advantor's voluminous opposition supported by depositions, exhibits, and a *joint* motion to file under seal a CD containing the claimed trade secrets. The brevity of analysis in the summary judgment order is in stark contrast to the depth of the factual record and legal arguments presented by the parties. And the order reads as if the court were functioning as fact-finder. Indeed, the district court's discussion of the summary judgment standard omits the usual rule about "construing all facts and drawing all reasonable inferences in favor of the nonmoving party." And this principle is not observed in the body of the order.

20

For example, on the trade secrets claim, the order just points out that "DRS argues that Advantor lost its property rights to the manuals when they were delivered to the government" and that "Advantor argues that the Air Force had no right to authorize the distribution or use of Advantor's manuals by DRS." Doc. 179 at 13. Then, with no citation of authority, it concludes that "Advantor's real issue in regard to the manuals and drawings is with the Air Force, not DRS" and (apparently on that basis) holds that "Advantor has failed to demonstrate that the information in the manuals constituted trade secrets." *Id*. at 13-14.

The order thus provides no meaningful analysis of Advantor's trade secrets claim – the evidence of the efforts Advantor took to protect the technical data in its manuals and IDS training materials and the other proprietary information that was subject to the NDA – or the fact that the Government did not negotiate "data rights clauses" for Advantor's contracts as necessary to pass on Advantor's proprietary information to other Air Force providers. The ruling, therefore, conflicts with hornbook government contracting law as well as the summary judgment standard.

In rejecting the tortious interference claim as a matter of law, the district court found that the recruited Advantor employees – though "performing the same work on the same bases as they performed during their employment with [Advantor]" – were not "engag[ing] in any activity competitive to Advantor'" –a finding that gives no weight to DRS' admission that DRS and Advantor were in

21

fact competitors. *See* Doc. 179 at 10-11; *cf.* Doc. 125 at 25-26, nn. 55-56. The order also unduly limits the scope of the non-compete clause, which barred a former employee from working for a company "engaged in a similar business to Advantor's" and from divulging "Advantor's confidential business methods, forms knowledge, information and experience acquired by Employee while employed by Advantor." *See* Doc. 179 at 8, 11. Because the record shows that the Advantor employees recruited by DRS did just that, the district court violated the summary judgment standard when it found in DRS' favor on this issue.

The order also found that the NDA's protections do not apply to pricing and other information that Advantor shared in reliance on the NDA for the limited purpose of discussing with DRS a proposed "partnering" arrangement for IDS work. In the district court's view, "boilerplate confidentiality language" in the email sending the materials is insufficient to invoke the NDA. Doc. 179 at 6. But this finding does not consider DRS' *admissions* that the pricing was proprietary and that it knew that all this information was being produced pursuant to the NDA.

In addition, the order found that there was no evidence of DRS' misuse of Advantor's proprietary information in violation of the NDA. Under the NDA, DRS could use of Advantor's confidential information *solely* for the purpose of "discussing" the potential opportunity for the parties to work together on a new IDS contract. The NDA also contained a "non-hire" provision, which barred DRS

22

from targeting Advantor's employees. Yet documents and testimony show that DRS copied Advantor's confidential information virtually verbatim into its bid in order to win this work, then announced that, instead of partnering with Advantor, it was going to "self-perform" – using Advantor's proprietary data and employees who were recruited by DRS in violation of the NDA's non-hire provision and the non-compete and confidentiality provisions of Advantor's employee-contracts. Given this evidence, it is for the jury to decide whether DRS breached the NDA.

The order also held that Advantor "has not met its burden of proving that [its] lost profits were caused by DRS's breach"; that "[d]isgorgement is also not an appropriate measure of damages"; and that Advantor cannot recover ancillary litigation expenses related to enforcing the non-compete and confidentiality agreements of the employees recruited by DRS. Doc. 179 at 7, 10. In fact this was the overarching ground for summary judgment in DRS' favor on every count – that, regardless of DRS' wrongdoing, Advantor has no remedy as a matter of law or equity. And, on this same basis, the district court excluded Advantor's expert evidence on disgorgement damages, lost profits, and litigation expenses.

In granting summary judgment on this basis, however, the district court overlooked Advantor's prayer for a permanent injunction to prevent DRS' continuing use of its proprietary information, which is an available remedy that requires no damage proof. Moreover, the damages rulings are flawed as a matter of

23

law and fact. Under FUTSA, damages "include both the actual loss caused by the misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." Fla. Stat. § 688.004(1). Similarly, under Virginia common law, which governs the NDA, disgorgement of ill-gotten gains is a remedy for this breach. *See, e.g., Eden Hannon & Co. v. Sumitomo Trust & Banking Co.*, 914 F.2d 556, 564 (4th Cir. 1990). And, under Florida law, which applies to the tortious interference claim, Advantor can recover as compensatory damages the expenses from legal actions to enforce its non-compete and confidentiality agreements with the employees recruited by DRS. *See Schwartz v. Bloch*, 88 So. 3d 1068, 1071 (Fla. Dist. Ct. App. 2012).

Finally, the district court erred in relying on Florida Statutes § 768.72 – a state procedural rule – to deny Advantor access to DRS' financial documents that are relevant to its punitive damages claim. Though there is a split among the district courts on this issue, this Court should review it *de novo* and hold that the discovery component of § 768.72(1), like its pleading requirement, does not apply in a federal diversity case such as this.

**3. Conclusion.** As discussed further below, the record contains evidence in support of each element of each cause of action under controlling substantive law. Accordingly, after conducting its *de novo* review – which applies to all issues in this appeal – the Court should reverse the summary judgment and the order

24

excluding Advantor's expert damages evidence because they are based on legal error and invade the province of the jury. Moreover, because the district court erred in relying on a state procedural rule to restrict Advantor's access to financial documents that are relevant to its punitive damages claim, that order cannot stand. Accordingly, the Court should remand the case for trial on all the causes of action and theories of recovery discussed below – with a right to seek a permanent injunction preventing future harm if the jury finds wrongful conduct on DRS' part.

## ARGUMENT AND CITATION OF AUTHORITIES

### I.  There is a Triable Issue as to Liability with Respect to Each Claim

#### A.  Advantor has shown that its proprietary data and information constitute trade secrets – even in the hands of the government – and that DRS misappropriated this valuable information

The district court accurately stated the elements of Advantor's trade secrets claim. "To prevail under FUTSA [Florida's Uniform Trade Secrets Act], the plaintiff must demonstrate that: (1) it possessed secret information and took reasonable steps to protect its secrecy and (2) the secret it possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it." Doc. 179 at 13. "Under Florida law, a trade secret consists of information that (1) derives economic value from not being readily ascertainable by others and (2) is the subject of reasonable efforts to maintain its secrecy." *Id*. The court erred, however,

in finding there is no genuine issue of material fact as to whether DRS

misappropriated Advantor's trade secrets.

### 1. Advantor's manuals and drawings constitute trade secrets even in the hands of the government

Advantor's technical manuals and drawings are the cornerstone of its trade

secrets claim, as DRS could not have performed under the SPAWAR contract

without these materials. As shown above, Advantor went to great lengths to protect

this proprietary technical data through restrictive legends and confidentiality

acknowledgements. Yet, with almost no discussion, the summary judgment order

holds that DRS' solicitation and use of this facially-protected information is not

actionable. Doc. 179 at 13–14.

On this issue, the summary judgment order just points out that "DRS argues

that Advantor lost its property rights to the manuals when they were delivered to

the government" and that "Advantor argues that the Air Force had no right to

authorize the distribution or use of Advantor's manuals by DRS." *Id*. at 13. Then,

with no citation of authority, it concludes that "Advantor's real issue in regard to

the manuals and drawings is with the Air Force, not DRS" and (apparently on that

basis) holds that "Advantor has failed to demonstrate that the information in the

manuals constituted trade secrets." *Id*. at 13–14. This is an error of law.

Under hornbook law, rights to a government contractor's technical data are

controlled by contract. *See* Ralph C. Nash & Leonard Rawicz, *Intellectual*

26

*Property in Government Contracts*, ch.4 pmbl., § 1, at B.1–.2.a (2015). The

Government "will not have the ability to use the data for any purpose, unless it has

both the legal right to make such use of the data and possession of the actual data."

*Id.* Thus, as a general rule, the contractor retains ownership of the technical data it

developed, and the Government receives only a license to use that technical data.

Doc. 181-26 at 1-1 to 1-4, 2-2 to 2-4; *see also* 48 C.F.R. § 227.7102-1 ("DoD shall

acquire only the technical data customarily provided to the public with a

commercial item or process."). Indeed, the Government does not generally "own"

a contractor's data even if it pays 100% of the development costs (which did not

occur here). Docs. 181-26 at 1–4; 181-28 at 109–15; 181-1 ¶ 3.

The government procurement regulations recognize that protection of

contractor data is "necessary to encourage qualified contractors to participate in

and apply innovative concepts to Government programs." 48 C.F.R. §§ 27.402(b),

227.7102-1. Accordingly, the regulations provide contract clauses—or "data rights

clauses" – that must be included in all procurements if the government intends to

acquire rights beyond a license to use the data. *Id.* § 227.7102-2(a); *see also id.* §

252.227-7015 (addressing "data rights clause" for government's use of "Technical

Data [in] Commercial Items").

Where, as here, the applicable government contract does not explicitly

incorporate any data rights clauses, the government has no right to transfer the data

27

to another government contractor. *See id.* § 227.7102-2. If additional rights are

needed, the government must negotiate with the contractor for such rights, and, if

acceptable, the additional rights are to be specifically enumerated in a license and

made part of the contract. *Id*; *see also* Doc. 181-29 at 217–18; *see also Xtec, Inc. v.

Cardsmart Techs., Inc.*, No. 11-22866, 2014 WL 10268426, at *9 (S.D. Fla. May

15, 2014) (genuine issue of material fact whether trade secret protected when "the

relevant [government] contracts omitted provisions transferring Xtec's proprietary

rights to the government"); *XTec, Inc. v. Hembree Consulting Servs., Inc.,* No. 14-

21029, 2015 WL 3797165, at *9–11 (S.D. Fla. June 18, 2015) (same), *J. awarded*,

Doc. 337 (Nov. 18, 2015) (entering judgment for plaintiff on jury verdict finding

defendant misappropriated trade secrets).

    In this case, the government never negotiated for such data rights for

Advantor's IDS products, services, and related manuals. Doc. 181-1 ¶ 4. Advantor

would not have agreed to such a clause in any event given the exclusive private

investment it made to develop its technology. *Id.* Therefore, the government's

possession and use of the confidential data in Advantor's IDS manuals and

drawings—information subject to the confidentiality legends and trade secret

acknowledgments noted above—does not eliminate the data's trade secret status.

And DRS did not acquire any right to use or disclose Advantor's trade secrets by

virtue of its dealings with the Government. *Id.* at ¶¶ 4–11; Doc. 181-29 at 217–18.

### 2. Evidence shows that DRS misappropriated Advantor's trade secrets

The summary judgment order similarly provides no meaningful analysis of remaining aspects of Advantor's trade secrets claim – the efforts that Advantor took to protect the proprietary information in its manuals, IDS training materials, and disclosures under the NDA. For example, the order questions whether the materials DRS received from Larson constitute trade secrets, but then concludes that they do not support Advantor's claim because "DRS denies utilizing any of the information provided by Larson, and Advantor has no evidence to the contrary." Doc. 179 at 14. That holding, however, ignores substantial record evidence.

Larson's emails discussing "Advantor Concepts" and "preventative maintenance" methods (which are subject to the joint motion to seal) address how Advantor's IDS concepts are applied using Advantor's privately developed proprietary system. For example, the concept of "ghosting" is well-known, but the specific steps for how to "ghost" an Advantor system are not. *See* Docs. 127-40 at 149–52; 138 (no. 15 in Seal Mot.). Larson's emails further provide highly specific descriptions of Advantor trade secret methods, *e.g.*, how to "partition" an alarm panel – which other manufacturers do not use.  Doc. 138 (no. 16 in Seal Mot.). Moreover, the summary judgment ruling does not address the evidence that DRS' program manager found this information helpful and directed Larson to pass it on

29

to other DRS technicians on the SPAWAR contract, which Larson did. *Id*.; Doc. 125 at 12, n.29; Doc. 127-45 at 2–3.

Similarly, the order finds that the tailored price quote that DRS received from Advantor for the limited goal of working together "did not reveal any pricing information" – a finding that directly conflicts with DRS' admissions on this subject. *See* Doc. 179 at 14; *cf.* Doc. 126-10 at 71–72 (admitting that DRS received proprietary pricing information from Advantor following execution of the NDA). The order, therefore, continues to make factual findings that do not construe the evidence in Advantor's favor as required by the summary judgment standard.

Moreover, a *de novo* review of the record reveals that a jury must decide whether DRS misappropriated all this information in violation of FUTSA. *See Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, LLC.*, 637 F.3d 604, 613 (5th Cir. 2011); *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288–89 (5th Cir. 1978); *Allegiance Healthcare Corp. v. Coleman*, 232 F. Supp. 2d 1329, 1335 (S.D. Fla. 2002); *All Pro Sports Camp, Inc. v. Walt Disney Co.*, 727 So. 2d 363, 368 (Fla. Dist. Ct. App. 1999).

Advantor has met its burden of proof on this claim. It has shown that it derives independent economic value from providing IDS services and materials to the Air Force using its state-of-the-art, privately developed IDS technology. Docs. 127-39 at ¶¶ 3–4; 181-1 at ¶¶ 3, 6, 8; 126-1 at 21–26, 69, 171. Advantor also has

shown that it took reasonable measures to prevent its technical data from becoming

generally known – an effort that DRS, SPAWAR, and the Air Force all recognized.

Docs. 127-39 at ¶¶ 3, 5–6; 181-1 at ¶¶ 7–11; 126-10 at 71–72; 181-4 at 97–98;

181-5 at 81; 181-9 at 64; 181-10 at 35–41, 48-49, 57–58; 126-4; 126-7.

In addition to the restrictions imposed by the NDA and the non-compete and

confidentiality provisions of the employee-contracts, all individuals receiving

Advantor's training must acknowledge, both in writing and verbally, the

confidential and trade secret nature of the training and associated IDS manuals.

Docs. 126-4 at 2, 4; 127-47; 126-2 at 75; 126-3; 181-13 at 66–67. The manuals

also have restrictive legends. Docs. 126-5; 138 (no. 8 in Seal Mot.).  And Advantor

kept track of who received its IDS manuals and training through an electronic

database in place since 2010, and through hard copy records prior to that time.

Doc. 181-13 at 30–31.

Case law holds that the trade secret status of such information is preserved

by these types of protections:

> This necessary element of secrecy is not lost, however, if the
> holder of the trade secret reveals the trade secret to another 'in
> confidence, and under an implied obligation not to use or
> disclose it.' … These others may include those of the holder's
> 'employees to whom it is necessary to confide it, in order to
> apply it to the uses for which it is intended.' … Often the
> recipient of confidential knowledge of the subject of a trade
> secret is a licensee of its holder.

*Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974) (citations omitted);

*see also Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1333 (N.D.

Ga. 2007) ("[T]rade secret protection is not destroyed by the 'usual situation' in

which secret information is shared with employees or other confidants who are

legally obligated, by express or implicit agreement or by another duty imposed by

law, to maintain its secrecy."); *Syncsort Inc. v. Innovative Routines, Int'l, Inc.*, No.

04-3623 (WHW), 2011 WL 3651331, at *15 (D.N.J. Aug. 18, 2011) ("Distribution

of [materials] to many users, even many thousands of them does not necessarily

negate trade secrecy status of the information contained in the guide.  That a trade

secret owner distributes secret materials outside of his business, but only does so

through agreements that require confidentiality, does not destroy the secrecy of

those materials, but rather reinforces it." (citing *Fabkom, Inc. v. R.W. Smith &

Assocs., Inc.*, Civ. No. 95–4552, 1996 WL 531873, at *7 (S.D.N.Y. Sept. 19,

1996)).

Moreover, Advantor has shown that DRS misappropriated its trade secrets.

FUTSA defines "misappropriation" to include: (1) acquiring trade secrets

improperly and (2) using trade secrets while knowing or having reason to know

that the information was obtained without consent from or through a person owing

a duty to the person seeking relief to maintain its secrecy or limit its use. *See* Fla.

Stat. § 688.002.  And the record shows that DRS did precisely that.

32

DRS admitted that it wanted, obtained, and used Advantor's proprietary information to perform under the SPAWAR contract. Docs. 127-13 at 165–71; 127-43; 127-44 ¶ 16; *see also* Docs. 181-9 at 393–94; 181-10 at 46–48, 53–55. But the evidence also shows that DRS knew that Advantor deemed all this information proprietary and protected it through non-disclosure provisions and restrictions on use found in the NDA, in Advantor's employee-contracts, and in the manuals themselves. *See supra* at 8–9, 11, 13.  And under Florida law, an employee is under a duty not to disclose trade secrets of a prior employer to a subsequent employer even without a contractual restraint. *See Marlite, Inc. v. Eckenrod*, No. 09-22607-CIV, 2011 WL 39130, at *7 (S.D. Fla. Jan. 5, 2011), *aff'd sub nom. Marlite, Inc. v. Am. Canas*, 453 F. App'x 938 (11th Cir. 2012); *Cataphote Corp. v. Hudson*, 422 F.2d 1290, 1295 (5th Cir. 1970).

DRS also knew that the government did not have the right to transfer data rights in Advantor's manuals to it, or to authorize use of the manuals without Advantor's consent. Docs. 127-42; 127-13 at 175–176.  The evidence shows that DRS improperly obtained these materials from a low-level contact at the F.E. Warren Air Force Base, Sgt. Verner, who wanted to work for DRS.  Docs. 127-43; 127-43; 127-13 at 165–71; 181-17.  DRS' program manager admitted that the wrongfully obtained manuals then were disseminated to DRS' technicians in the field for use. Doc. 127-13 at 170–71. DRS also improperly obtained manuals from

33

Advantor's former employee, John Ellfeldt, despite DRS' knowledge of Advantor's non-compete and confidentiality agreements with its former employees. Docs. 127-41 at 3; 179 at 9.

The record further shows that, knowing that it was not legally entitled to use the Advantor manuals obtained from Verner, DRS internally discussed "Dissemination Ideas." Doc. 126-42. Notably, DRS decided not to ask the Air Force or Advantor for use-approval. *Id.* Instead, DRS asked its SPAWAR contacts to deem the material after-the-fact as "Government Furnished Information" – in effect, to disguise DRS' misappropriation. *Id.*; *see also* Doc. 127-66. After sending only a couple of pages of one of the manuals to an unnamed SPAWAR counsel, SPAWAR complied with DRS' request – but only for the F.E. Warren base and not the entire field that had received these manuals. Docs. 125 at 11–13; 127-13 at 165–91; 127-11 at 105, 168–186, 208; 127-46.

DRS' attempted *post facto* sanitization of its conduct cannot eliminate the evidence that DRS acquired and used Advantor's manuals when it knew that Mr. Verner and the former Advantor employees were obliged to maintain their secrecy and the improper way these manuals were acquired. *See* Docs. 179 at 9; 127-42; 127-43; 127-28; 127-44 at ¶ 35; 127-41. By definition, this is misappropriation. *See* Fla. Stat. § 688.002; *see also Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1411 (11th Cir. 1998) ("A defendant

34

misappropriates a trade secret by knowingly acquiring it through improper means.") (applying Georgia UTSA and holding summary judgment premature when a competitor may have knowingly used customer lists that were shared for a limited purpose); *Telecom Tech. Servs. Inc. v. Rolm Co.*, 388 F.3d 820, 832–33 (11th Cir. 2004) (upholding verdict finding trade-secret misappropriation when competitor used passwords acquired from former employee); 12 Roger M. Milgrim & Eric E. Bensen, *Milgrim on Trade Secrets* § 7.02(2)(c) at 7-93 (2012). At the very least, when construed in Advantor's favor, this evidence raises a jury question as to DRS' liability on the trade secrets claim.

### B. DRS' admissions show tortious interference with the confidentiality and non-compete provisions of Advantor's employee-contracts

Under Florida law, the elements of a claim for tortious interference with contract are: (1) the existence of an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the contract; (3) an intentional and unjustified interference by the defendant with the plaintiff's rights under the contract; and (4) damage to the plaintiff as a result of the interference. *See*, *e.g.*, *Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001).

The district court recognized that, in this case, genuine issues of material fact exist as to: (1) whether DRS intended to tortiously interfere with Advantor's employee-contracts – which DRS admitted knowing about; and (2) whether the

35

confidentiality and non-compete provisions of Advantor's employee-contracts were justified and therefore enforceable. Doc. 179 at 9, 11 n.5, 12. Yet the court concluded that there was no issue to be tried on the tortious interference claim because, according to the district court, DRS' conduct did not involve competitive activity that would interfere with the non-compete clause and did not cause any compensable damage in any event. *Id.* at 9–13. This ruling, however, cannot be upheld based on this record.

The summary judgment order recognized that DRS recruited Larson, Ellfeldt, and Alvarez to perform "'the same work on the same bases as they performed during their employment with [Advantor].'" *Id*. at 10–11. But it then found that "by doing so, the trio was not 'directly or indirectly engag[ing] in any activity competitive to Advantor." *Id*. at 11. The order concluded that "[e]ven though they were being hired to perform 'the same work on the same bases as they performed during their employment' with Advantor, Larson, Ellfeldt and Alvarez were not competing with their former employer because their former employer could no longer do those jobs." *Id*. at 11. But this reasoning conflicts with the terms of the non-compete clause, which is quoted in the order itself. *See id*. at 8.

The non-compete clause is not limited to activity that is in direct competition with Advantor. Rather, it covers activity that is "indirectly" competitive, including any "association" with a company "engaged in a similar business to Advantor's."

36

*Id*. And, in the non-compete clause, the employees specifically agreed not to "divulge or give to any other person or firm the benefit or advantage of Advantor's confidential business methods, forms knowledge, information and experience acquired by Employee while employed by Advantor." *Id.* Indeed, the order notes that "[d]isclosure of confidential information is barred even to non-competitors." *Id.* at 11 n.5.

It cannot be rationally disputed that, when DRS hired these employees "to perform 'the same work on the same bases as they performed during their employment' with Advantor," these employees were associating with a company "engaged in a similar business to Advantor's" in violation of the non-compete clause. Further, the record shows that these employees also violated the clause's prohibition against divulging "Advantor's confidential business methods, forms knowledge, information and experience acquired by the Employee[s] while employed by Advantor."

Moreover, the record shows that, contrary to the district court's finding, there is at least a jury issue as to whether Advantor and DRS were competitors. As an initial matter, DRS actually conceded Advantor is its competitor. *See* Doc. 125 at 26 ("Yes, they [Advantor] have a *proprietary system* that is installed at some locations we are currently supporting, and *they are our competitor*.") (citing DRS 37300) (emphasis added). This admission, written by DRS' program manager post-

37

award, shows that DRS considered Advantor to be its competitor even after winning the SPAWAR contract and excluding Advantor from it. *Id.*

Second, even after the SPAWAR contract was awarded, Advantor continued to perform IDS warranty work at the Air Force bases – work that the three defecting employees would have done for Advantor had they not been hired away. Docs. 126-7; 126-6; 127-11 at 208–09; 125 at 4; 174 at 49–50. DRS even discussed internally the warranty work being performed by Advantor technicians simultaneously with DRS technicians working at certain bases under the SPAWAR contract in February 2014 (post-award). *See* Doc. 127-41.

Third, the district court incorrectly assumed that DRS had *permanently* obtained the right to perform IDS maintenance at the 19 Advantor sites at issue. The SPAWAR contracts were only for one year at a time and no evidence indicates that the work would continue to be administered by this Navy contracting entity rather than returning to direct contracts with the Air Force. Docs. 125 at 13 n.34; 126-8 at 30. Moreover, opportunities existed for Advantor to partner with other government contractors who were eligible to bid on SPAWAR work, as was discussed with DRS when the NDA was put into place, and then later with another prime contractor. Docs. 125 at 13 n.34; 127-39 ¶ 10.  In addition, DRS could compete against Advantor to do IDS work on its equipment at non-SPAWAR sites.

38

Finally, given the SPAWAR contract's Certification Requirement, which had the effect of requiring Advantor- and Vindicator-certified personnel to perform the work, a reasonable fact finder could interpret that requirement to mean that only Advantor-certified personnel could perform maintenance on Advantor IDS equipment under the SPAWAR contract. Indeed, "DRS acknowledge[d] the critical requirements for manufacturer certifications for the Vindicator and Advantor systems" in its proposal to SPAWAR. Doc. 138 (no. 22 in Seal Mot. at 910010).

In light of the above record facts, it must be concluded that a jury question exists on whether or not DRS tortiously interfered with the non-compete and confidentiality clauses of Advantor's employee-contracts by "poaching" the three Advantor employees to enable it to "self-perform" under the SPAWAR contract. Further, as discussed *infra*, the district court's damages ruling likewise is flawed because Advantor has shown a right to relief for this wrongful interference under lost profits and wrongful act doctrine theories – not to mention its right to a permanent injunction as requested in its pleadings and the pretrial order.

**C. A jury question exists as to whether DRS breached its own contract with Advantor by recruiting Advantor's employees and usurping its data**

Under Virginia law, which governs this claim, whether a restrictive covenant has been breached generally is a jury question. *See, e.g.*, *Preferred Sys. Solutions, Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 682 (Va. 2012). The summary

39

judgment order here violates that rule by overlooking material record evidence showing that DRS breached the NDA between Advantor and DRS.

### 1.  Evidence shows that DRS breached the non-hire provision

First, contrary to the district court's finding, there is evidence that more than a non-actionable general job posting was involved here. For example, Alvarez considered the DRS posting to be directed at the technician position at Edwards Air Force base that he then held for Advantor. Docs. 127-21; 127-25 ¶ 4. The posting went to jobs in "[a]nticipation of [the] USAF maintenance task order award" – the SPAWAR project, which explicitly called for Advantor-certified technicians. Doc. 127-19. Additionally, the ad sought technicians at the particular base locations where Advantor's equipment was located and listed "Advantor Intrusion Detection System (IDS) equipment" experience as "Additional Desirable Skills and Knowledge." *Id.*; Docs. 126-1 at 149; 127-20 at 144.

It also is undisputed that Advantor was one of only two certified IDS manufacturers approved by the Air Force with equipment covered by the SPAWAR contract. Thus, while a portion of the ad listed 29 types of security systems, the record shows that DRS was aggressively pursuing applicants certified on these two Approved Equipment List systems in order to meet the minimum requirements for the SPAWAR bid and to be able to maintain the equipment. *See* Docs. 125 at 7, n.11; 126-8 at 37–40; 127-54; 127-52. DRS needed both Advantor-

certified and Vindicator-certified personnel to perform, and the evidence reflects that DRS was specifically targeting applicants certified—or at least experienced—on those two systems. Docs. 125 at 18; 127-54; 127-15 at 129, 141; 181-12.

In addition, the district court's finding that the Advantor employees initiated contact with DRS conflicts with Larson's deposition testimony, stating that DRS' recruiter, Vanessa Morrison, initially contacted him about a position with DRS; documents additionally show that Morrison was the "source" for Larson's hiring. Morrison also recommended Alvarez, who was the hiring source for Ellfeldt. Docs. 125 at 17–18; 127-29 at 112–15; 127-22; 127-23; 127-24; 127-37.

Moreover, Morrison specifically asked Larson to apply for the regional manager position, and directed him to go to the DRS website to do so. Docs. 125 at 17; 127-37; 127-29 at 112–15. After Larson applied to DRS, DRS' Don Curtis told the recruiting team that it was "extremely important" to "treat Greg [Larson] like GOLD and make sure his transition to DRS is as smooth as possible." Doc. 127-26. Curtis stressed that Larson "is key to [DRS'] ability to support Advantor systems." *Id*.

DRS also aggressively targeted Alvarez by offering him an increased hourly rate as a "critical candidate" for supporting Advantor equipment on Edwards Air Force base. Doc. 127-27; *see also* Doc. 125 at 8 (citing Dep. Ex. 250 ranking Alvarez and Ellfeldt as "A+" recruiting candidates, but acknowledging that DRS

41

may have "a problem hiring [Alvarez] away from Advantor" and "[w]ould need to talk to Advantor" about hiring a "Very Impressive" Ellfeldt); 126-10 at 209 (DRS' program manager explaining that "A+" candidates are necessary to meet an "extremely urgent" or "highest priority" need).

All of this evidence must be construed in favor of Advantor, the non-movant, who is entitled to all reasonable favorable inferences to be drawn from the record. After conducting its de novo review, therefore, this Court should reverse and remand on this issue because the record reveals a genuine issue of material fact as to whether DRS breached the NDA's non-hire provision.

## 2. The evidence shows that DRS used Advantor's proprietary information in violation of the NDA

The district court found that there is no evidence that DRS misused Advantor's confidential information in violation of the NDA. Again, in granting summary judgment on this issue, the district court failed to give any weight to contrary evidence favoring Advantor's position. The record shows that DRS knew that Advantor provided it with proprietary pricing information and past performance details in reliance on the NDA, and that DRS copied this information to its own bid, which it then used to win the SPAWAR contract – a use that was not authorized by the NDA.

Indeed, DRS has admitted that it knew that Advantor was providing this information pursuant to the NDA solely in furtherance of the working together on

the SPAWAR project. Docs. 126-10 at 71–72; 127-35. And DRS has admitted that the pricing information it received from Advantor pursuant to the NDA is proprietary in nature. Doc. 126-10 at 72; *see also Banks v. Mario Indus. of Va., Inc.*, 650 S.E.2d 687, 691 (Va. 2007) (affirming jury verdict on trade-secret claim when former employee and competitor's principal "admitted that it was improper . . . to reveal [plaintiff's] confidential information," including prices). Moreover, the evidence shows that the "past performance" information was painstakingly compiled by Advantor specifically for this bid and had great value in the aggregate to DRS. Docs. 127-35; Doc. 135-2 at 142–44 (testifying that the information about Advantor in DRS' bid was "material" to DRS winning the bid). In light of this evidence, the district court erred in finding that the information was not covered by the NDA simply because a "boilerplate" confidentiality notice was contained in the email through which Advantor transmitted the data to DRS.

Similarly, the court erred in holding that there was no evidence of DRS' misuse of Advantor's proprietary pricing information. The NDA explicitly allowed DRS to use Advantor's pricing and past performance information *solely* for the purpose of "discussing" the potential opportunity for the parties to work together on the SPAWAR Project. Doc. 127-16 ¶¶ 2, 4. The NDA expressly prohibited DRS from using Advantor's proprietary pricing and past performance information for any other purpose. *Id.* Yet, DRS has admitted using Advantor's tailored pricing

43

information to competitively lower its bid price not only to cut Advantor out of its

bid, but to ensure it could outprice any other prime contractors considering using

Advantor as a subcontractor. Docs. 125 at 9–11, 37; 127-32; *see also* Doc. 126-9 at

73–75; 127-35; 174 at 18–19. In fact, the documents show that DRS "pasted"

Advantor's past performance information directly into its bid for the SPAWAR

contract – without Advantor's knowledge or consent. Doc. 138 (*compare* p. 24774

at no. 18, *with* p. 910010-11 at no. 22 in Seal Mot.).

Given this evidence, it is for the jury to decide whether DRS made an

unauthorized use of Advantor's pricing and past performance information to cut

Advantor out of the project so that it could reap the profits for its exclusive benefit.

*See Preferred Sys.*, 732 S.E.2d at 682. Moreover, as shown below, Advantor can

prove and recover damages for this wrongdoing.

## II.  The District Court Erred in Holding that Advantor Cannot Prove Damages

The primary ground cited by the district court for entering summary

judgment in DRS' favor on all of Advantor's claims is its view that – regardless of

the evidence of DRS' wrongful conduct – Advantor cannot prove compensable

damages. Doc. 179 at 6-7, n.2, 10, 14–15. According to the district court, Advantor

is precluded from showing causation because DRS did not accomplish its

misappropriation of Advantor's proprietary information and the poaching of

Advantor employees until after SPAWAR – at DRS' behest – took over the

44

administration of IDS services at the 19 Air Force bases having Advantor annunciators. *Id.* The district court's damages analysis is flawed as a matter of law and fact. Moreover, this ruling overlooks Advantor's prayer for a permanent injunction to prevent DRS' continuing use of its proprietary information, which is an available remedy that requires no proof of damage. *See* Doc. 82 at 17, 22.

### A. Advantor has a right to recover disgorgement damages

Advantor's opposition to summary judgment showed that, regardless of any proof of its own actual loss, it is entitled to recover disgorgement damages as a remedy for DRS' unjust enrichment through the misappropriation of Advantor's proprietary information. Doc. 125 at 39–40, n.74. Moreover, the disgorgement remedy applies both to the trade secrets claim that is governed by Florida law and the violation of the NDA, to which Virginia law applies. *See* Fla. Stat. § 688.004(1); *Sensormatic Elecs. Corp. v. Tag Co. US, LLC*, 632 F. Supp. 2d 1147, 1187 (S.D. Fla. 2008); *Eden Hannon & Co. v. Sumitomo Trust & Banking Co.*, 914 F.2d 556, 564 (4th Cir. 1990) (applying Virginia law); *see also USM Corp. v. Marson Fastener Corp.*, 467 N.E.2d 1271, 1276 (Mass. 1984) (disgorgement remedy approved even though plaintiff waived claim to its own losses).

Indeed, by statute, Advantor's misappropriation damages "include both the actual loss caused by the misappropriation *and the unjust enrichment* caused by misappropriation that is not taken into account in computing actual loss." Fla. Stat.

§ 688.004(1) (emphasis added). Similarly, under Virginia common law, disgorgement of a defendant's ill-gotten gains is a recognized measure of equitable damages for breach of an NDA. *Eden Hannon*, 914 F.2d at 564–65 (finding that, because it may be difficult to prove a specific amount of profits lost due to a "free-rider," disgorgement damages are an available equitable remedy).

The summary judgment order, however, simply states that "[d]isgorgement also is not an appropriate measure of damages" without discussing FUTSA's authorization of unjust enrichment damages. Doc. 179 at 7. And it holds as a matter of law that the equitable remedy of disgorgement is not available to remedy a breach of a non-disclosure agreement – but cites no Virginia law for this proposition. Doc. 179 at 6, n.2.  Accordingly, because the order conflicts with controlling law on this issue, it must be reversed.

This error also infects the trial court's order holding that Advantor cannot offer an expert opinion on the amount of disgorgement damages because "DRS's profit does not equate to the value of Advantor's loss" and "is thus irrelevant." Doc. 167 at 4–5. This ruling, therefore, must be reversed because it conflicts with the remedies authorized by FUTSA and Virginia law.

The error of law runs even deeper because the trial court held that a plaintiff must prove the defendant's net gain to be entitled to disgorgement damages. Doc. 167 at 6. To the contrary, courts across the country have held that, once a plaintiff

46

shows the revenue received by the defendant as a result of misappropriation, the

burden then shifts to the defendant to prove the actual profits and the costs that

should be deducted from that revenue. *See, e.g., Cartel Asset Mgmt. v. Ocwen Fin.*

*Corp.*, 249 F. App'x 63, 78–79 (10th Cir. 2007); *Injection Research Specialist, Inc.*

*v. Polaris Indus., L.P.*, 168 F.3d 1320 (Fed. Cir. 1998); *Gen. Clutch Corp. v.*

*Lowry & CEMA Tech., Inc.*, 10 F. Supp. 2d 124, 131 (D. Conn. 1998); *Petters v.*

*Williamson & Assocs., Inc.*, 210 P.3d 1048, 1054 (Wash. Ct. App. 2009); *Marson*

*Fastener Corp.*, 467 N.E. 2d at 1276; *Carter Prods., Inc. v. Colgate-Palmolive*

*Co.*, 214 F. Supp. 383, 398 (D. Md. 1963). DRS' own expert agreed with these

burden-shifting principles. Doc. 123-4 at 157–58.

Finally, the district court erred in rejecting Advantor's proof on causation

grounds. The summary judgment order states that there is no basis for awarding

disgorgement damages because, in the district court's view, "Advantor has made

no showing that any of DRS' profit on the SPAWAR Contract was attributable to

the hiring of the three Advantor employees or the information Advantor disclosed

to it." Doc. 179 at 7 n.2. This, however, is but another example of the district court

acting as fact-finder.

Again, the record shows that DRS won the SPAWAR contract through a bid

that used Advantor's proprietary pricing information and copied almost verbatim

Advantor's past performance description in violation of the NDA. Further, the

record shows that DRS did not have personnel certified on Advantor's IDS equipment (or even experienced with Advantor's systems) as required by the SPAWAR contract. The record, therefore, strongly supports a finding that DRS would not have won the SPAWAR contract in the first place, nor been able to "self-perform" in Year 1, nor have been in a position to win the Year 2 contract, *but for*: (1) its misappropriation of Advantor's technical manuals, drawings, training materials, proprietary pricing data, performance history, and other confidential information; and (2) its complete disregard of the NDA's non-hire clause and the non-compete and confidentiality provisions of Advantor's employee-contracts in order to "self-perform" the SPAWAR contract.

In sum, this Court must reverse the disgorgement rulings in both the summary judgment order and the order excluding Advantor's expert evidence and opinions because they conflict with damages law and the summary judgment standard that entitles Advantor to all reasonable inferences supported by the record.

### B. Lost profits also are an available remedy

The district court further erred in rejecting lost profits as an available remedy for DRS' wrongful conduct. *See* Doc. 179 at 10. A lost profits award is one of the remedies for tortious interference, misappropriation of trade secrets, and breach of contract. *See* Fla. Stat. § 688.004(1) (allowing proof of actual loss in

addition to disgorgement damages); *E. Qualcom Corp. v. Global Commerce Ctr. Ass'n, Inc.*, 59 So. 3d 347, 351 (Fla. Dist. Ct. App. 2011) (upholding jury verdict for lost prospective profits upon a showing that the defendant's wrongdoing harmed the plaintiff, which used yardstick theory to prove its loss); *R.K. Chevrolet, Inc. v. Hayden*, 480 S.E.2d 477, 482 (Va. 1997).

Moreover, it is well-established that where fact of damage is shown, the amount of damage need not be shown with absolute certainty. *Fidelity Interior Constr., Inc. v. S.E. Carpenters Reg'l Council of United Bhd. of Carpenters & Joiners of Am.*, 675 F.3d 1250, 1265 (11th Cir. 2012); *see also United States v. Killough*, 848 F.2d 1523, 1531 (11th Cir. 1988) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."). As the Supreme Court has instructed:

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931).

49

Many cases use the before-and-after method:  "The fact of damage is made out upon proof that the plaintiff's level of profits ... is ... less than it otherwise would have been absent some intervening cause." *Fidelity Interior Constr.*, 675 F.3d at 1265. In *Fidelity*, for example, this Court approved a jury award of lost prospective profits upon proof that a union's wrongful picketing interfered with a subcontractor's opportunities to bid on work. *Id.* Similarly, Advantor adduced proof that, but for DRS' wrongful "self-performance" using Advantor's misappropriated proprietary information and "poached" employees, it had opportunities to "partner" with DRS and other SPAWAR-eligible prime contractors to provide IDS services at the 19 Air Force bases equipped with Advantor annunciators. Supra at 9–13. Indeed, the Certification Requirement in the SPAWAR RFQ and contract can be viewed as requiring that result. *See* Doc. 127-12 at 060010 (stating that contract personnel "shall have current A7S AEL approved annunciator certification for IDS components").

Thus, like *Fidelity*, Advantor is entitled to have a jury decide whether DRS' wrongful conduct harmed it and what profits it lost as a result, which can be proven through a yardstick or a "before-and-after" measurement. *See* 675 F.3d at 1265; *see also G.M. Brod & Co., v. U.S. Home Corp.*, 759 F.2d 1526, 1537 (11th Cir. 1985) ("[It is] settled law of Florida that proof of profits for a reasonable time

50

anterior to the breach is required to establish lost profits."); *R.K. Chevrolet*, 480 S.E.2d at 482 (allowing lost profits proven by a before-and-after comparison).

In fact, it is difficult to imagine how Advantor *could not* have been harmed by DRS' multi-faceted and continuing scheme to appropriate Advantor's lucrative IDS business for itself – from the "white paper" written and submitted by DRS that prompted the switch to SPAWAR as the contracting agency, to DRS' inducing Advantor employees to divulge Advantor's trade secrets and compete with it, to DRS' accessing and misuse of Advantor's confidential pricing information and performance history under the pretense of discussing a partnering arrangement. At the very least, applying the summary judgment standard to this evidence, a jury question exists as to whether Advantor was harmed by DRS' wrongdoing – particularly because Advantor lost its largest customer to DRS as a result of this course of conduct. Given this record, the district court erred in ruling as a matter of law that Advantor cannot recover lost profits. This Court, therefore, should reverse both the summary judgment order (Doc. 179) and the order excluding Advantor's expert opinion on lost profits, which rested on this same basis (Doc. 167).

## C. Ancillary state-court litigation expenses are compensable

The district court also rejected as a matter of law Advantor's claim for the ancillary litigation expenses that it incurred pursuing enforcement of the confidentiality and non-compete provisions in its contracts with the employees that

DRS wrongfully solicited. The sole ground for this ruling is the holding in *Bauer v. BILIB, Inc.*, 16 So. 3d 318, 319 (Fla. Dist. Ct. App. 2009). Doc. 179 at 9–10. The *Bauer* decision, however, does not support this ruling for two reasons.

First of all, DRS did not contest this item of damages in its summary judgment motion, and "a party threatened by summary judgment must receive notice and an opportunity to respond." *Imaging Bus. Mach., LLC v. BancTec, Inc.*, 459 F.3d 1186, 1191 (11th Cir. 2006). As this Court observed when reversing a summary judgment based on a damages issue not raised in the motion:

> BancTec's motion for summary judgment only raised the issue of injury as to Imaging Business Machine's claim for fraud. Imaging Business Machines responded on the issue of damage only as it pertained to its claim of fraud. Thus, the district court's consideration of the element of damage as to the remaining claims was *sua sponte*. As the district court did not comply with Rule 56(c), failing to notify Imaging Business Machines that it would be considering the issue of injury as to each of the remaining claims, the grant of summary judgment on the issue of injury as to these claims was procedurally improper and must be vacated.

*Id.* Because DRS did not contest this element of damage and did not even cited *Bauer*, the summary judgment on this issue was improper. *See, e.g.*, *id.*; *Gentry v. Haborage Cottages-Stuart, LLLP*, 654 F.3d 1247, 1261 (11th Cir. 2011).

Second, under Florida's established wrongful act doctrine, Advantor is permitted to seek the litigation expenses it incurred in state court actions against its former employees as an element of compensatory damages under its tortious interference claims. While *generally*, "Florida conforms to the 'American Rule,'

52

under which attorneys' fees are awarded only when permitted by statute or contract," *Johnson Enters. of Jacksonville, Inc. v. FLP Grp.*, 162 F.3d 1290, 1329 (11th Cir. 1998), the wrongful act doctrine is an exception. Specifically:

> [W]here the wrongful act of the defendant has involved the claimant in litigation with others, and has placed the claimant in such relation with others as makes it necessary to incur expenses to protect its interests, such costs and expenses, including reasonable attorney's fees upon appropriate proof, may be recovered as an element of damages.

*Schwartz v. Bloch*, 88 So. 3d 1068, 1071 (Fla. Dist. Ct. App. 2012); *see also, e.g.*, *id.* at 1071; *Reiterer v. Monteil*, 98 So. 3d 586 (Fla. Dist. Ct. App. 2012); *Horowitz v. Laske*, 855 So. 2d 169 (Fla. Dist. Ct. App. 2003); *City of Tallahassee v. Blankenship & Lee*, 736 So. 2d 29 (Fla. Dist. Ct. App. 1999); *cf.* Jeremy M. Colvin, *The Wrongful Act Doctrine: A Common Law Exception to the American Rule on Entitlement to Attorneys' Fees in Florida*, Fla. B.J., Dec. 2015, at 9 (noting that Florida's "wrongful act doctrine is a genuine, long-recognized exception to the rule on entitlement of attorneys' fees in Florida").

Here, Advantor sued DRS for tortious interference with Advantor's noncompete and confidentiality agreements with former employees. Because of DRS's tortious interference, Advantor was also forced to separately sue the employees in state court for their breach. Under the wrongful act doctrine, therefore, the litigation expenses that Advantor incurred in the state court cases against its former employees are an element of recoverable, *compensatory*

damages resulting from DRS' tortious interference. *See Schwartz*, 88 So. 3d at 1071; *Wright v. Nigh*, 399 So. 2d 515, 517 (Fla. Dist. Ct. App. 1981).

Moreover, *Bauer* is inapposite. In *Bauer*, a plaintiff sued two former employees for breach of their non-compete agreements. 16 So. 3d at 319. The plaintiff also sued the employees' new employer *in the same case* for damages as a result of the new employer's tortious interference. *Id.* Importantly, the plaintiff sought attorney's fees under Florida Statutes § 542.331(1)(k), a statute which provides for *prevailing party fees* where an employer seeks to enforce a restrictive covenant. The court held that § 542.331(1)(k) was inapplicable and that the plaintiff was not entitled to fees.

In the present case, however, Advantor is not seeking attorney's fees under § 542.331(1)(k). Advantor is seeking to recover its litigation expenses *as compensatory damages* based on the wrongful act doctrine, which is explicitly permitted by *Schwartz*. Accordingly, the district court erred in holding that *Bauer* forecloses Advantor's entitlement to damages on its tortious interference claim.

### III. State Procedural Law Does Not Apply to the Punitive Damages Claim

Advantor has sought punitive damages in every iteration of its complaint. Docs. 1 at 13; 32 at 16–18; 82 at 18–22. And the district court concluded that a jury question exists as to whether DRS intentionally interfered with Advantor's employee-contracts. Indeed, the evidence of DRS' malice towards Advantor is

compelling and includes: (1) DRS telling Larson "not to worry" about his non-

compete with Advantor; (2) DRS saying it would "blow Advantor away" because

of how much bigger DRS is compared to Advantor; (3) DRS telling a former

Advantor employee not to feel sympathetic to Advantor (as DRS was purloining

Advantor's manuals from the employee) because "sympathy" is in the dictionary

"between shit and syphilis"; (4) DRS encouraging the government to replace

Advantor's equipment on Air Force bases and stating, "Let's slap Advantor back";

(5) DRS providing SPAWAR with "ammunition for removing Advantor" from the

Government's approved equipment list; (6) DRS asking "[h]ow much money [it]

will . . . take to knock Advantor out of the running in the future"; and (7) DRS

admitting that its "hot button" issue was "the demise of Advantor." *See* Docs. 127-

37 at ¶ 9; 127-41; 127-13 at 156, 159; 126-8 at 216–217; 127-48; 126-9 at 153–

159; 127-49; 127-50; 127-51.

In connection with its punitive damages claim, Advantor moved to compel

DRS' financial statements and other documents showing revenue, profit, and costs

on the project. Docs. 65; 47 at 12.  The magistrate judge denied the motions,

holding that Advantor had not met the evidentiary threshold for access to financial-

worth documents under Florida law. Docs. 80; 79 at 1. The district court then

overruled Advantor's objections to the magistrate's orders. Doc. 98.  And it is

apparent that this ruling is based on Florida Statutes § 768.72—which requires an

evidentiary threshold to be met prior to obtaining net worth discovery. This statute, however, should not restrict Advantor's access to DRS' financial documents because § 768.72 is a matter of state procedural law.

This Court already has held that § 768.72's pleading requirement is a state procedural rule that conflicts with Rule 8 of the Federal Rules of Civil Procedure and thus is not applicable in a federal action based on diversity of citizenship. *See Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1072 (11th Cir. 2000). But it has not addressed whether the evidentiary requirement of the statute is also in conflict with the federal rules. *Porter v. Ogden, Newell & Welch*, 241 F.3d 1334, 1340 (11th Cir. 2001) (declining to rule on the evidentiary requirement). Moreover, since *Porter*, a significant split among the districts has developed on the issue. *Compare Haaf v. Flagler Constr. Equip., LLC*, No. 10-62321-CIV, 2011 WL 187119, at *2–3 (S.D. Fla. May 16, 2011), *and Soliday v. 7-Eleven, Inc.*, No. 2:09-cv-807-FtM-29SPC, 2010 WL 4537903, at *2 (M.D. Fla. Nov. 3, 2010) (requiring an evidentiary threshold), *with Pantages v. Cardinal Health 200, Inc.*, No. 5:08-cv-Oc-10GRJ, 2009 WL 1011048, at *1 (M.D. Fla. Apr. 15, 2009), *and Ward v. Estaliero Itajai S/A*, 541 F. Supp. 2d 1344, 1359 (S.D. Fla. 2008) (holding that the evidentiary requirement conflicts with the Federal Rules and is inapplicable).

This Court therefore should clarify this issue and hold that the discovery component of § 768.72(1), like the pleading requirement, is a state procedural rule

that does not apply in federal diversity actions. Section 768.72(1) does not explicitly require a separate evidentiary showing to proceed with net worth discovery; it only states that "no discovery of financial worth shall proceed until after the pleading concerning punitive damages is permitted." Because *Cohen* permits pleading of punitive damages without an evidentiary showing in federal court, the only logical extension to that holding is that an evidentiary showing in federal court is not required.

In addition, the evidentiary requirement directly conflicts with Rule 26, which authorizes parties to "[o]btain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b). "[J]ust as § 768.72 must yield to the application of Rule 8 of the Federal Rules of Civil Procedure, it must also yield to the federal rules governing the scope and timing of discovery in federal courts." *Pantages*, 2009 WL 1011048, at *3.

Thus, because the evidentiary requirement of § 768.72 conflicts with Rule 8, Rule 26, and *Cohen* and its well-reasoned progeny, it should be held inapplicable in federal diversity cases. Under federal procedure, therefore, Advantor is entitled to discovery of information that is relevant to its punitive damages claim unrestricted by a state procedural rule such as § 768.72 – information that includes DRS' financial documents.

# CONCLUSION

The summary judgment in DRS' favor cannot stand because it is based on fact-finding by the district court that conflicts with material record evidence. And the order excluding Advantor's expert damages evidence and opinions must be reversed for the same reason. Moreover, the district court erred in relying on a state procedural rule to restrict Advantor's access to financial documents that are relevant to its punitive damages claim. The Court, therefore, should reverse the judgment and remand the case for trial on all causes of action and theories of recovery discussed below – with a right to seek a permanent injunction preventing future harm if the jury finds wrongful conduct on DRS' part.

/s/ Laurie Webb Daniel
Laurie Webb Daniel
HOLLAND & KNIGHT LLP
One Atlantic Center, Suite 2000
1201 West Peachtree Street, N.E.
Atlanta, Georgia 30309-3400
(404) 817-8500
laurie.daniel@hklaw.com

Min K. Cho
Florida Bar No. 754331
HOLLAND & KNIGHT LLP
200 S. Orange Ave., Suite 2600
Orlando, FL 32801
(407) 425-8500
min.cho@hklaw.com

Brandon H. Elledge (*pro hac vice*)
HOLLAND & KNIGHT LLP

1600 Tysons Blvd., Suite 700
Tysons Corner, VA 22102
(703) 720-8015
brandon.elledge@hklaw.com

*Attorneys for Plaintiff-Appellant*
*Advantor Systems Corporation*

# STATEMENT OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,925 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 14 point font.

/s/ Laurie Webb Daniel
Laurie Webb Daniel
HOLLAND & KNIGHT LLP
One Atlantic Center, Suite 2000
1201 West Peachtree Street, N.E.
Atlanta, Georgia 30309-3400
(404) 817-8533
laurie.daniel@hklaw.com

# CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2016, I filed a copy of the foregoing brief with the Clerk of Court using the Appellate CM/ECF system and served copies of such filings via e-mail and first-class mail on the following attorneys of record who represent Appellee/Defendant DRS Technical Services, Inc.:

Nicole A. Sbert
Jackson Lewis, PC
Suite 1285
390 N Orange Ave
Orlando, FL 32801
(407) 246-8440
sbertn@jacksonlewis.com

Stephanie Leigh Adler-Paindiris
Jackson Lewis, PC
Suite 1285
390 N Orange Ave
Orlando, FL 32801
(407) 246-8440
adlers@jacksonlewis.com

/s/ Laurie Webb Daniel
Laurie Webb Daniel
HOLLAND & KNIGHT LLP
One Atlantic Center, Suite 2000
1201 West Peachtree Street, N.E.
Atlanta, Georgia 30309-3400
(404) 817-8533
laurie.daniel@hklaw.com