No. 15-14992-FF

_____

In the

# United States Court Of Appeals

For the

# Eleventh Circuit

_____

Advantor Systems Corporation,

*Plaintiff/Appellant*

vs.

DRS Technical Services, Inc.,

*Defendant/Appellee*

_____

On Appeal from the United States District Court
Middle District of Florida

_____

# REPLY BRIEF

_____

Laurie Webb Daniel
Brandon Elledge
Min K. Cho
HOLLAND & KNIGHT LLP
1180 West Peachtree Street, Suite 1800
Atlanta, Georgia 30309
Tel:  404-817-8533
Fax:  404-881-0470

*Attorneys for Plaintiff-Appellant Advantor Systems Corporation*

*Advantor Systems Corporation v. DRS Technical Services, Inc.*, No. 15-14992

# CERTIFICATE OF INTERESTED PERSONS
# AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record for Plaintiff-Appellant Advantor Systems

Corporation ("Advantor") submit the following Certificate of Interested Persons

and Corporate Disclosure Statement pursuant to Rule 26.1 of the Federal Rules of

Appellate Procedure and Rules 26.1-1 and 26.1-2 of the Rules of the United States

Court of Appeals for the Eleventh Circuit:

1.   Adler-Paindiris, Stephanie L. (counsel for Appellee)

2.   Advantor Systems Corporation (Appellant)

3.   Baker, David (United States Magistrate Judge)

4.   Chiu, Alicia M. (counsel for Appellee)

5.   Cho, Min (counsel for Appellant)

6.   Daniel, Laurie Webb (counsel for Appellant)

7.   DRS Technical Services, Inc. (Appellee)

8.   DRS Technologies, Inc. (former-party defendant)

9.   Elledge, Brandon (counsel for Appellant)

10.   Finmeccanica, S.p.A. (publicly traded company on the Italian

stock exchange that owns 10% or more of DRS Technologies,

Inc.'s stock; ticker symbol: FNC.MI)

11.   Gilbert, Suzanne E. (counsel for Appellant)

12.   Holland & Knight LLP (counsel for Appellant)

C-1

*Advantor Systems Corporation v. DRS Technical Services, Inc.*, No. 15-14992

13.  Infrasafe, Inc. (parent company of Appellant)

14.  Jackson Lewis P.C. (counsel for Appellee)

15.  Jones, David A. (counsel for Appellant)

16.  Losey, Ralph (counsel for Appellee)

17.  Meccanica Holdings USA, Inc. (wholly owned subsidiary of
     Finmeccanica, S.p.A., parent and holding company of DRS
     Technologies, Inc. (former-party defendant))

18.  Millcarek, Lauren (counsel for Appellant)

19.  Udell, Collin O'Connor (counsel for Appellee)

20.  Presnell, Gregory (United States District Court Judge)

21.  Sbert, Nicole (counsel for Appellee)

22.  Van Oot, Martha (counsel for Appellee)

Respectfully submitted,

/s/ Laurie Webb Daniel
Laurie Webb Daniel
HOLLAND & KNIGHT LLP
One Atlantic Center, Suite 2000
1201 West Peachtree Street, N.E.
Atlanta, Georgia 30309-3400
(404) 817-8500
laurie.daniel@hklaw.com

*Attorneys for Plaintiff-Appellant*
*Advantor Systems Corporation*

C-2

# TABLE OF CONTENTS

I.  INTRODUCTION ..........................................................................................1

II.  FACTS ....................................................................................................2

    DRS wanted to "blow Advantor away" ...................................................2

    DRS authored the SPAWAR "white paper" .............................................3

    Advantor's manuals and technical data are proprietary ...........................4

    Advantor protected its confidential information ......................................5

    DRS misrepresented facts to win the SPAWAR contract.........................7

    DRS targeted Advantor's employees ......................................................9

    DRS obtained Advantor's data through breach-of-covenants .................10

    DRS used Advantor's manuals and data to reap profits for itself............13

III.  ARGUMENT ........................................................................................14

    A. DRS must be held accountable for its wrongdoing............................14

        1. Causation is for the jury to decide ............................................14

        2. Alternative remedies are available............................................16

    B. Substantial evidence supports each cause of action ...........................19

        1. The misappropriation of trade secrets.......................................19

        2. The tortious interference and violations of the NDA ..............22

IV.  CONCLUSION ......................................................................................24

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.*,
    139 F.3d 1396 (11th Cir. 1998) ............................................................... 20

*Eden Hannon & Co. v. Sumitomo Trust & Banking Co.*,
    914 F.2d 556 (4th Cir. 914 1990) ................................................. 17

*Entrekin v. City of Panama City Florida*,
    376 F. App'x 987 (11th Cir. 2010) ............................................... 15

*Hinson v. Clinch County, Georgia Board of Education*,
    231 F.3d 821 (11th Cir. 2000) ................................................. 3, 15

*Hirel Connectors, Inc. v. United States*,
    No. CV01-11069, 2005 WL 4958589 (C.D. Cal. Jan. 4, 2005) ................... 21

*Imaging Business Machines, LLC v. BancTec, Inc.*,
    459 F.3d 1186 (11th Cir. 2006) ................................................. 23

*Manufacturing Research Corp. v. Greenlee Tool Co.*,
    693 F.2d 1037 (11th 1982) ....................................................... 15

*Moyer v. Martin Marietta Corp.*,
    481 F.2d 585 (5th 1973) .......................................................... 15

*Remijas v. Neiman Marcus Group, LLC*,
    794 F.3d 688 (7th Cir. 2015) .......................................................3

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931)................................................................. 14

**Statutes**

Florida Statutes § 768.72 ........................................................... 18, 19

**Regulations**

48 C.F.R. § 252.227-7015................................................................. 21

# I.    INTRODUCTION

DRS makes the same mistake as the summary judgment order. It tells only one side of the story. Under the summary judgment standard, however, DRS is not entitled to rely on disputed facts, and Advantor is entitled to all favorable inferences from the evidence. Keeping this standard in mind, the ruling below must be reversed because substantial evidence supports every element of Advantor's trade secret, tortious interference, and NDA claims.

This is not a simple fact pattern and it does not fit DRS' simple answers. It starts with DRS' "white paper," which proposed switching the management of Advantor's Air Force contracts to the SPAWAR agency. It involves intentional misrepresentations (later revealed by DRS' internal emails) that were key to DRS' winning the SPAWAR contract, such as the DRS proposal itself, which said that Advantor was a "strategic partner" adding the expertise and certifications that DRS needed to perform—even though DRS already had decided to cut Advantor out of the deal. It continues with DRS' asking a low-level Air Force employee (who wanted a job at DRS) to give it Advantor's technical data in violation of restrictive legends, the employee's pledge of confidentiality, and Advantor's contracts—then getting another Advantor manual from a former Advantor employee with full knowledge that the employee's restrictive covenants prohibit this very thing. And there are other well-documented wrongful acts too.

1

DRS says that it cannot be held accountable for this deception, interference, and outright stealing because Advantor was prevented from bidding on the contract for work it had performed for years. That fact, however, is integral to DRS' overall scheme to usurp Advantor's most valuable business relationship and trade secrets —and to do so through improper means. Further, but for DRS' bad acts, Advantor could have performed as a subcontractor even after SPAWAR entered the picture.

The law does not take such a restrictive approach to remedies. Advantor has a right to injunctive relief to bar DRS from profiting from the misappropriations. In addition, the trade secrets statute expressly allows unjust-enrichment damages, and Virginia case law permits disgorgement damages for the NDA violations. Under Florida law, Advantor also has the right to recover lost profits arising from DRS' interference with its ability to perform maintenance work on the Advantor systems installed on the Air Force bases, whether as a subcontractor (or as a warranty service-provider). Advantor also has shown the precise monetary damages it suffered from DRS' tortious interference with its employee-contracts—the costs incurred to seek judicial enforcement of the restrictive covenants.

DRS cannot distinguish the authorities under which Advantor has not only actionable claims but viable remedies as well. In fact, it just ignores most of them. Accordingly, after its *de novo* review of the record and the law, this Court should reverse the summary judgment and remand for trial on all counts.

2

## II.    FACTS

Numerous disputed and unrebutted facts compel reversal.[1]

### *DRS wanted to "blow Advantor away"*

DRS did not cross-appeal the district court's ruling that the record raises a jury issue as to whether DRS intended to tortiously interfere with Advantor's employee-contracts. *See* Doc. 179 at 11 n.5; *see also Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688, 697 (7th Cir. 2015) ("[A]n appellee who does not cross-appeal may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary." (internal citations omitted)). In any event, there is ample evidence that DRS acted with malice towards Advantor. The record shows that DRS wanted to "blow Advantor away"; "slap Advantor back"; provide SPAWAR "ammunition for removing Advantor" from the approved-equipment list; "knock Advantor out of the running"; and bring about "the demise of Advantor." Opening Br. at 55 (including record citations).

### *DRS authored the SPAWAR "white paper"*

DRS' conduct cannot be viewed in isolated segments. *See Hinson v. Clinch Cty., Ga. Bd. of Educ.*, 231 F.3d 821, 827 (11th Cir. 2000).  Construing the entire record in favor of Advantor as required by the summary judgment standard, *id.*,

---

[1] Numerous exhibits from the summary judgment proceedings are contained in the CD noted at Doc. 111. Many of these were refiled as exhibits to Advantor's emergency motion to stay the summary judgment order. Doc. 181. For convenience, this brief refers to the exhibits to Doc. 181 whenever possible.

3

there is proof of a continuing scheme to usurp Advantor's Air Force work—
starting with the "white paper" authored by DRS; continuing with the use of
misrepresentations about a purported partnership with Advantor to win the
SPAWAR contract and then the targeting of Advantor's employees; and
culminating with misappropriation of Advantor's manuals and other data to enable
DRS to profit from servicing the Advantor intrusion-detection systems ("IDS") at
the Air Force bases. Indeed, DRS does not even try to rebut the white-paper
evidence or the misrepresentations it made in its SPAWAR proposal.

### *Advantor's manuals and technical data are proprietary*

DRS contends that the Air Force had "unlimited rights" in Advantor's
manuals, but this is disputed. Even DRS agreed that Advantor had a "proprietary
system with a business model that restricts certification and training." Doc. 181-5
at 3. The Air Force also agreed that "Advantor systems are proprietary. All
maintenance must be performed by Advantor certified technicians." Doc. 181-11 at
2. And DRS initially admitted that it did not have the right to use Advantor's
manuals to perform under the SPAWAR contract.

> Q.  Just to clarify a point from a few moments ago. You had stated,
> Mr. Hoover, that the DRS folks that you were dealing with had
> originally acknowledged that Advantor training and materials are
> proprietary; is that right?...
>
> [A.] Yes, that was my impression, that they knew it was proprietary
> and they couldn't work on those systems.

4

Doc. 181-10 at 17 of 39; *see also id*. at 12 of 39.

DRS now wants to contradict its earlier admissions, and refers the Court to the testimony of David DeLaRue. DeLaRue, however, was not an authorized contracting officer for the Air Force nor the contract officer for this project. Doc. 127-15 at 124–25, 139–42. Neither he nor DRS' other government witnesses on this issue reviewed Advantor's contracts, and they admitted that they were not qualified to know whether Advantor's contracts with the Air Force had data rights clauses. Docs. 127-11 at 185-86; 111 (DeLaRue Dep. at 165–67). On the other hand, both sides' experts agreed that Advantor's Air Force contracts did not have data rights clauses to give the Government unlimited rights in Advantor's proprietary data.  Docs. 127-62 ¶ 83; 127-63 at 77–78. Advantor's president, Mr. Whirley, affirmed that Advantor did not and would not grant the Government the right to give other contractors its proprietary data. Doc. 181-33 at 2–3. Advantor's data also fit the NDA's definition of proprietary information. Doc. 181-41 at 2.

### *Advantor protected its confidential information*

DRS' discussion of Advantor's protective measures is particularly off-base. Advantor's manuals contain unmistakable confidentiality legends, and everyone attending its training sessions—whether or not employed by Advantor—has to acknowledge the protected trade secret status of its materials and information. Doc. 181-33 at 3–5 (explaining Advantor's confidentiality measures).

5

DRS has cited Ms. Staggs' deposition as support for its position, but Ms. Staggs in fact confirmed that Advantor *always* insisted on confidentiality:

> Q. [D]o you require non-employees to sign any type of confidentiality agreement?
>
> A. Yes.
>
> Q. Do government employees have to sign confidentiality agreements?
>
> A. It's – on the sign-in sheet….
>
> Q. Is there anything that Advantor does to protect information that's provided during the training classes?
>
> A. Yes. … Our materials that we provide are stamped proprietary. We verbally announce to the attendees that the information they are about to receive is proprietary and to be protected as such. …
>
> Q. When you say verbally announce to the class, first of all, does that happen in every single class?
>
> A. Yes. …
>
> Q. Has Advantor, to your knowledge, always used a sign-in sheet for training classes?
>
> A. Yes.

Doc. 181-13 at 7–9 of 12. Advantor also required employees and subcontractors to sign confidentiality agreements. Doc. 181-15 at 5; 181-33; *see also* Doc. 181-9 at 5 of 9 (Larson Dep.) ("It was just slapped on every document that we did").

For example, Alvarez expressly agreed to protect Advantor's data as a condition of working on Advantor equipment, first as a subcontractor and then as an Advantor employee. Docs. 126-3; 181-15. Unrebutted evidence (just ignored by DRS) establishes that Advantor kept logs of everyone who received its training and

manuals—initially through hardcopy records and then through an electronic database after 2010. Doc. 181-13 at 30–31. And Advantor did not send its pricing or past performance data to DRS until it had the NDA. *See* Doc. 181-41. To the extent that DRS disputes any of this, the issue is for the jury to decide.

### DRS misrepresented facts to win the SPAWAR contract

DRS does not dispute the fact that its SPAWAR proposal represented that Advantor was a critical part of its "team"—a "strategic partner." *See* Seal Mot. no. 22. To buttress this statement, DRS copied Advantor's past performance data into its proposal almost verbatim. *Id.* at 910010–11; *cf.* Seal Mot. no. 18 at 24774. Further, contrary to DRS' assertions, this was not publicly available information. Doc. 111 (Whirley 30(b)(6) Dep. at 184–92); *see also* Doc. 181-33 at 3. Advantor compiled this past performance data and specifically tailored it for the teaming proposal set forth in DRS' SPAWAR bid. *Id.* Indeed, DRS told Advantor that it was "dying" to have this information—which is incompatible with the notion that it was easily obtainable from the internet. *See* Doc. 127-35.

Significantly, a Government witness testified that all these representations were material to the decision to award DRS the SPAWAR contract:

Q. And you found DRS's proposal to be the winning proposal?
A. Based on the criteria they were selected as the winn[er]….
Q. And that means that technical factors are being reviewed, right?
A. Correct.

7

Q.  Past performance, correct?

A.  Correct. …

Q.  [I]s it fair to say, representations made by government contractors when they submit proposals to the government [are] important representations?

A.  Yes, we evaluate what they propose.

Q.  You believe them to be true in order to make an award based on the content of what's said in those representations in a contractor's proposal, correct?

A.  Yes, that's correct.

Doc. 126-8 at 19–20; *see also* Doc. 135-2 at 144 (Kowalski/SPAWAR)

(representations about Advantor's participation were material to award).

The record shows, however, that DRS made these representations knowing that they were false. DRS' internal emails show that, by the time DRS submitted its proposal, it had already decided "to kill" the idea of involving Advantor in the work. Doc. 127-32. DRS thus falsely traded on Advantor's reputation and past performance data to win the SPAWAR contract despite knowing that it was going to drop Advantor from its team.

Moreover, before the proposal was submitted, Advantor's vice president asked about Advantor's role on the team, but DRS did not tell him the truth either. DRS' subcontract-administrator internally conceded: "I really did not have a good answer for him due to risk to our strategic position [to eliminate Advantor]."  Doc. 127-33; *see also* Doc. 126-9 at 82–83, 160. Thus, there is strong record evidence

8

that DRS won the SPAWAR contract through misrepresentations and omissions of material facts to the Government and Advantor.

### *DRS targeted Advantor's employees*

By the time DRS told Advantor it was going to "self-perform," it was already recruiting Advantor's IDS personnel. DRS claims that it did not "target" Advantor's employees as prohibited by the NDA. But that is not how Alvarez viewed it, and he was one of the targeted employees. Alvarez considered DRS' job posting to be directed at the very position he had at Advantor. Docs. 127-21; 127-25 ¶ 4. DRS ignores this evidence, however, and also Larson's testimony that DRS' recruiter started the discussions with him and then directed him to the DRS website to apply for the job. Doc. 127-37; s*ee also* Opening Br. at 40-42 (including record citations). As Larson testified:

> [T]hey called me and I told them I couldn't talk and that I needed to go outside because I couldn't talk to them where I was working at…. they'd say go out and call us back when you got a chance.

Doc. 127-29 at 112–14.

Further, DRS not only knew that it was a violation of its NDA to target Advantor's employees, it knew that the Advantor employee-contracts prohibited any "association" with a company "engaged in a similar business to Advantor's." *See* Doc. 127-28. DRS does not dispute that, when Larson raised his non-compete, it said "not to worry … [DRS will] blow Advantor away." Doc. 127-29 at 370–71.

9

### *DRS obtained Advantor's data through breach-of-covenants*

DRS' recruiter and its program manager told Larson that DRS wanted him to show DRS how to work on Advantor equipment. Doc. 111 (Larson Dep. at 351). Larson, therefore, sent training documents to DRS containing specific information on how other manufacturers' equipment interfaces with Advantor's IDS systems, *i.e.* technical nonpublic data. Docs. 126-2 at 159, 167–68; 126-40 at 102–04; *see also* Doc. 138 (Seal Mot. nos. 1–7, 12, 15–17). After his hire, Larson also sent detailed information about "Advantor Concepts" to DRS—again, confidential data that, as Larson noted, "may look strange to non-Advantor techs." Doc. 138 (Seal Mot. no. 16). Larson's boss at DRS found these "Advantor Concepts" helpful and told Larson to pass them on to other DRS technicians, which he did. Docs. 127-45; 138 (Seal Mot. no. 16). While DRS disputes the value of these documents, that is an issue for the jury.[2]

DRS still lacked sufficient experience with Advantor's equipment, however. *See* Doc. 181-10 at 10 of 39. So DRS asked for and obtained Advantor manuals from Advantor trainees in violation of their pledges of confidentiality. One came

---

[2] DRS terminated Larson after receiving a demand letter from Advantor's attorney. Docs. 40-2 at Ex. 1; 79 at 5–6. But DRS did not preserve Larson's DRS laptop despite Advantor's directive to do so—something the district court found "mystifying." Doc. 79 at 13; *see also* Docs. 40-2 at Ex. 1; 79 at 6, 12–13. Despite forensic evidence "of Advantor intellectual property on Larson's DRS issued computer," Doc. 181-40 at 15, the district court declined to sanction DRS for destroying this proof. Doc. 79 at 13.

from a low-level contact at an Air Force base who was seeking employment at

DRS, Sergeant Verner. *See* Docs. 181-17 at 2; 181-20. Verner, however, had

repeatedly signed Advantor training logs stating that he should not do this:

> The Information provided in this training class, which may be
> communicated in writing or verbally, is considered Proprietary and
> Confidential to Advantor. These instructional materials also contain
> trade secret information of Advantor. This information may be used
> only for its intended purpose and may not be disclosed without the
> express written consent of Advantor Systems Corporation.

Doc. 181-18.

DRS obtained another copy of an Advantor manual from John Ellfeldt after

recruiting him away from Advantor in violation of his restrictive covenants. *See*

Doc. 181-22 (Ellfeldt email to DRS' Jeff Waldon) ("If you look through the

training manuals sent to you by myself"). As the district court noted, Ellfeldt's

contract barred disclosure of confidential information even if the recipient was not

a competitor. Doc. 179 at 11 n.5. And Ellfeldt knew, just as DRS knew, that the

manuals contained protected information. Doc. 181-4 at 4. After all, they contained

this confidentiality notice:

> This information is intended solely for the individual or entity to
> which it is addressed and may contain confidential and/or privileged
> material. Any review, transmission, dissemination or other use of or
> taking action in reliance upon this information by persons or entities
> other than the intended recipient is prohibited. …

Doc. 181-16 at 2.

11

It was only after obtaining the Advantor manuals in violation of various restrictions that DRS' program manager, Chris Cummings, decided to see if it might be possible to convert the manuals into "government furnished information" or "GFI." A February 2014 internal email from Cummings stated:

> I am thinking though instead of sending to the ESS POC [electronic security system points of contact at the Air Force base], we send to SPAWAR, have them send it back to us as GFI, and then we can send directly to our techs. I will ask SPAWAR about that option. I am just afraid that if we get the ESS POCs involved, some will hold onto it out of fear of Advantor.

Doc. 181-19 at 3 of 6. His recipient at DRS, Jeff Waldon, responded:

> That works. Let's provide SPAWAR with the hard copy to return to us & request written authorization from them to repro for use by the program at Advantor sites. Then we can burn hard & soft copies.

*Id.*; *see also id.* at 2 of 6 (stating that Cummings was going to keep Advantor manuals when turning over another copy to SPAWAR).

In a March 2014 email, Cummings also mentions FAR 52.227-14—a government-contract regulation—and stated: "I think there is a case here for the Air Force to authorize another Contractor access to the material in the performance of the duties under the contract." Doc. 127-66.

Cummings' emails document the fact that DRS did not obtain the Advantor manuals in good-faith reliance on legal advice from SPAWAR regarding government furnished information. To the contrary, DRS first improperly obtained the manuals from Advantor confidants, then gave the manuals to SPAWAR (while

12

keeping a copy). The notion of "government furnished information" did not

originate from SPAWAR but from DRS itself, who was scouring the federal

regulations in search of a justification for this misappropriation. DRS' excuse,

however, is inadequate, as explained by Advantor's government-contract expert,

Mr. Adams, and by the regulations themselves. *See* Docs. 181-27; 181-29.

Advantor also has shown that the "memorandum of agreement" part of the

SPAWAR award does not allow distribution of Advantor materials without a

provision in Advantor's contracts granting the Air Force the authority to release

Advantor's protected data. Doc. 181-29 at 217–18; *see also* Doc. 111 (Jordan Dep.

at 44–46).  While DRS' expert has a different opinion, *see* Doc. 181-28, that just

shows that the GFI issue is hotly disputed.

### *DRS used Advantor's data to reap profits for itself*

While DRS disputes this fact, the record shows that DRS disseminated the

manuals and drawings it received from Verner into the entire field for its

technicians to use. Doc. 127-13 at 170–71. Further, DRS admits that it has had to

use these manuals to perform under the SPAWAR contract. *See* Docs. 126-8 at 45–

46, 139–41, 167–68, 211–12, 217–18; 127-11 at 152–53; 181-35 ¶ 16. DRS says

that it used the manuals for the Air Force's benefit, but the fact remains that DRS

has received revenues of at least $14.1 million as a result. Docs. 129-2; 158 at 9.

13

## III.  ARGUMENT AND CITATION OF AUTHORITIES

### A.  DRS must be held accountable for its wrongdoing

DRS' main argument is that, regardless of wrongdoing, it cannot be held accountable because, according to DRS, there is insufficient proof of compensable damages. DRS forgets, however, that Advantor's pleadings ask for injunctive relief barring future use of information derived from Advantor's proprietary data—relief requiring no showing of damages. Further, DRS has no response to this principle: "Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931); *see also* Opening Br. at 49.

#### 1.  Causation is for the jury to decide

DRS' damage causation argument fails for several reasons. First, the summary judgment standard does not allow the Court to view the evidence in isolated segments as DRS urges. The Court must consider the entire record and in particular construe *de novo* the evidence cited by Advantor in its favor.

> "[T]he court should give credence to the 'evidence favoring the nonmovant as well as that evidence supporting the moving party that is *uncontradicted and unimpeached*, at least to the extent that that evidence comes from disinterested witnesses.'" … In other words, [it] must consider the entire record, but "disregard all evidence favorable to the moving party that the jury is not *required* to believe."

14

*Hinson*, 231 F.3d at 826–27 (emphasis added) (internal citations omitted); *see also*

*Entrekin v. City of Panama City Fla.*, 376 F. App'x 987, 996 (11th Cir. 2010) (per

curiam) (noting that series of events can show causation in employment context).

Second, it is well established that causation issues are peculiarly in the

province of the jury.

> It is a settled principle of Florida law that the issue of proximate
> causation is a factual question and ordinarily one for jury
> determination. Florida Jurisprudence comments: "The general rule is
> that the proximate cause of an injury is ordinarily a question for the
> jury, the court instructing them on what the law requires to constitute
> it, the jury applying the law to the facts. It is not a question of science
> or of legal knowledge. It is to be determined as a fact, in view of the
> circumstances of fact attending it. Thus, unless the minds of
> reasonable men could not differ as to the cause of an injury, the
> problem of determining the existence of proximate cause is one for
> the jury.

*Moyer v. Martin Marietta Corp*., 481 F.2d 585, 593 (5th Cir. 1973) (reversing

directed verdict on causation issue); *see also Mfg. Research Corp. v. Greenlee Tool*

*Co*., 693 F.2d 1037, 1042 (11th Cir. 1982) (rejecting challenge to causation proof

in tortious interference claim under Florida law).

Third, the evidence in this record at a minimum supports the reasonable

inference that DRS did in fact harm Advantor by intentionally and tortiously

interfering with its contracts, misappropriating its trade secrets, and breaching the

NDA. A reasonable jury could conclude that DRS would not have won the

SPAWAR contract but for its misrepresentation that Advantor was part of its team,

bringing all the "past performance" experience that SPAWAR considered material. Further, a reasonable jury could conclude that, had DRS not won, Advantor would have teamed with the winner, given its unique qualification as the manufacturer of the equipment to be maintained and the contract's certification requirement. A reasonable jury also could conclude that, regardless of DRS' fraud in winning the contract, DRS would have been unable to perform but for its misappropriation of Advantor's proprietary data and poaching of its employees. And, if DRS had not done that, there is a reasonable probability that DRS would have paid Advantor to do the work as a subcontractor, as DRS itself had proposed initially. If nothing else, a reasonable juror could conclude that, when DRS recruited Advantor's employees with full knowledge of their restrictive covenants, DRS harmed Advantor by causing it to incur the costs of going to court to enforce its restrictive covenants. Under controlling law, all these questions are for the jury to resolve.

### 2. Alternative remedies are available

The Florida trade secret statute recognizes that proving damage may be hard in misappropriation cases and thus provides for disgorgement as an alternative to recovering lost profits. *See* Opening Br. at 45–46. DRS does not rebut this point. *See* DRS Br. at 49–50. It just repeats its mantra, its conclusory contention that it should not have to disgorge profits from a contract that Advantor could not bid on. But that is not the law. DRS must be held accountable for its misappropriation.

16

DRS does address the disgorgement remedy in connection with the NDA claim, *See* DRS Br. at 25, 30. Although DRS does not acknowledge that the district court incorrectly applied Florida law to the NDA claim because Virginia law governs the NDA, it tries to distinguish the Virginia case cited by Advantor, *Eden Hannon & Co. v. Sumitomo Trust & Banking Co.*, 914 F.2d 556, 564 (4th Cir. 1990). DRS argues that *Eden* is inapposite because it involved competitors for the same work. DRS, however, ignores its own post-award admission that Advantor is in fact its competitor—an admission that DRS does not (and cannot) now challenge. *See* Opening Br. at 11. The competitive nature of this relationship is obvious from DRS' decision to "self-perform" in lieu of allowing Advantor to do this work as a subcontractor. Given this record, DRS cannot distinguish *Eden*, and it must be concluded that the disgorgement remedy is available for both the trade secrets and NDA claims.[3]

Regarding Advantor's lost profits proof, DRS never addresses this Circuit's case law holding that, once fact of injury has been shown, proof of amount need not be shown with absolute certainty. *See* Opening Br. at 49. As discussed above, Advantor has presented powerful evidence of DRS' intent to destroy Advantor's

---

[3] DRS also has not rebutted Advantor's discussion of the burden of proof on the disgorgement issue. Now that Advantor has shown the revenues DRS received under the SPAWAR contracts (at least $14.1 million), Docs. 129-2; 158 at 9, it is up to DRS to prove how much should be deducted for its expenses. *See* Opening Br. at 46–47.

17

Air Force business through misrepresentations and misappropriations and the serious injury resulting from the loss of this work. Under the law of this Circuit, this evidence is sufficient to create a jury question as to lost profits. *Id.* at 49–51.

DRS also offers only conclusory self-serving arguments in response to Advantor's claim for the costs of having to seek judicial enforcement of the restrictive covenants in its employee-contracts. DRS concedes that Florida observes the "wrongful act" doctrine, which is an exception to the American rule on attorney's fees. DRS Br. at 40. But DRS claims that there is no actionable evidence that it misappropriated or misused Advantor's trade secrets or tortiously interfered with Advantor's employee-contracts. *Id.* at 41. Those issues are hotly disputed, however, and the record must be construed in Advantor's favor. Moreover, DRS is unable to show that the litigation expense issue was raised in its summary judgment motion as necessary to dispose of this claim. Like DRS' summary judgment filings, the transcript page that it cites, "DE 174:13," says nothing about litigation expenses. *See* DRS Br. at 40 n.10. Summary judgment on this claim, therefore, was error.

Finally, DRS' discussion of the punitive damages issue is completely muddled. Advantor does not challenge a discretionary ruling on the admissibility of punitive damages evidence; it contests the district court's erroneous reliance on state procedural law, Fla. Stat. § 768.72(1), to deny it access to DRS' financial

information. The district court agreed with the magistrate judge that Advantor "has

not made a showing of punitive damages entitlement sufficient to warrant

discovery of Defendant's financial condition." Doc. 98. There can be no doubt that

this ruling was based on the standard set forth in § 768.72(1), as the parties' papers

specifically addressed the state procedural statute when discussing Advantor's

attempt to get this financial information. *See* Docs. 65, 78. Thus, the state law

procedural issue was squarely before the district court, and it is that ruling that is

included in Advantor's appeal. Moreover, the district court committed legal error

in relying on Florida procedural law to restrict Advantor's access to financial

documents relevant to its punitive damage claim. *See* Opening Br. at 54–56.

Indeed, even if § 768.72(1) were applicable to this case, the district court erred in

not considering the overwhelming record evidence of DRS' intent to harm

Advantor.

### B.  Substantial evidence supports liability

#### 1.  The misappropriation of trade secrets

Advantor's manuals are one (but not the only) example of misappropriation

accomplished by DRS through various improper means. Their characterization as

trade secrets is confirmed by their restrictive legends and the technical nature of

their contents. They easily fit the statutory definition of trade secrets and, as

evidenced by the declaration of Advantor's president, were continuously treated as such by Advantor. Doc. 181-1 (Whirley Decl.).

DRS contends that Advantor did not adequately protect these trade secrets, but it relies on snippets from the record that are contradicted by other sources, including the restrictive legends on the manuals themselves. In addition, Advantor required everyone receiving training on its equipment to sign a form stating that this information was trade-secret and proprietary and not to be disclosed to others. Advantor's instructors also verbally repeated the need to protect this proprietary information during classes. Advantor's employees were required to sign restrictive covenants, as were others, as demonstrated by the NDA signed by Alvarez when he first gained access to the manuals as a subcontractor to Advantor. Doc. 181-15 at 7–10. Moreover, DRS does not address the case law cited by Advantor which holds that protections of the sort used by Advantor are adequate to preserve confidentiality even if thousands of people are covered by them. *See* Opening Br. at 31–32. Under these circumstances, a jury must decide whether Advantor sufficiently protected the confidentiality of its manuals. *Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1411 (11th Cir. 1998).

DRS next argues that there is no evidence that it obtained Advantor's manuals through wrongful means. Again, however, this is just DRS' version of the facts. DRS claims that it was entitled to receive the manuals under the SPAWAR

contract, but it would not have had that purported contractual access but for the

misrepresentations in its bid. Moreover, Advantor has presented evidence that the

memorandum of agreement provision in the SPAWAR contract did not enlarge the

Government's data rights beyond what the Government already held. As DRS has

noted, Advantor has cited hornbook law for the point that the Government did not

have unlimited data rights in these manuals because it never negotiated the clauses

required by federal regulations to establish such rights. It is not just hornbook law

that supports this principle, however. Regulations and case law do too, as well as

the report of Advantor's government-contract expert, Mr. Adams. *See* Opening Br.

at 26–28; Docs. 181-27; 181-29.

DRS tries to dodge this point by calling the manuals "form, fit and function"

or "FFF" data. But Mr. Whirley and Mr. Adams also have explained why the

manuals do not constitute "form, fit and function data." *Id.*; Doc. 181-33 at 3 ¶ 4.

That designation does not apply to the manuals because of their proprietary

contents—and the Air Force has acknowledged repeatedly that the Advantor

systems are proprietary in nature. *Id.*; Doc. 181-11 at 2. Even with respect to

"FFF" data, the Government does not receive unlimited rights where, as here, there

are *no* data rights clauses in the contracts. *See* 48 C.F.R. § 252.227-7015(b)(1)(ii),

(iv); *cf. Hirel Connectors, Inc. v. United States*, No. CV01-11069, 2005 WL

4958589, at *2–4 (C.D. Cal. Jan. 4, 2005) (addressing contract having a DFARS

21

provision governing FFF data). At a minimum, it is a jury question whether the nature of the contents of the manuals required a negotiation of data rights.

DRS' claim that Advantor's manuals are GFI fares no better. DRS obtained the manuals in the first place—not from appropriate governmental authorities—but from Verner and Ellfeldt, both of whom were obliged to protect the confidentiality of these trade secrets. This is a classic example of misappropriation in violation of FUTSA § 688.002(1), which defines "improper means" as including "inducement of a breach of a duty to maintain secrecy." Further, the record shows that DRS originated the GFI plan, proposing that DRS should give the Government one of the manuals that it had already misappropriated and then ask the Government to give it back to DRS as "government-furnished-information." Such a plan cannot exonerate the prior misappropriation, however. Indeed, DRS initially expressed the view that it could not use the manuals. Even when it came up with the GFI idea, it had doubts whether the maneuver would satisfy the regulations. *See* Doc. 127-66. And it does not. *Supra* at 21. While there is conflicting expert evidence on this point, it certainly cannot justify summary judgment in DRS' favor.

## 2. The tortious interference and NDA claims

DRS' treatment of the tortious interference and NDA claims follows the same approach as its other arguments. DRS continues to ignore the evidence favorable to Advantor. For example, regarding DRS' interference with Advantor's

22

employee-contracts, DRS overlooks the language prohibiting its employees from associating with any similar business upon leaving Advantor's employment. Given the breadth of this provision, DRS cannot prevail regardless of its competition with Advantor. DRS, however, has not disavowed making the statement that Advantor was a competitor even after the SPAWAR contract's award. DRS also ignores Larson's testimony that DRS' recruiter contacted him first. And, regarding the nature of the "Advantor Concepts" that Larson handed over to DRS, DRS presents only its self-serving description of the material. The sealed record shows, however, that these concepts were technical in nature and not publicly available. Accordingly, a jury must determine whether DRS tortiously interfered with the restrictive covenants in Advantor's employee-contracts when it received this information from Larson and told him to distribute it to other DRS technicians.

By the same token, a jury must decide whether the pricing and "past performance" data that Advantor sent DRS pursuant to the NDA was a protected compilation of business information. *See Imaging Bus. Machs. v. BancTec, Inc.*, 459 F.3d 1186, 1193 (11th Cir. 2006) (reversing summary judgment and holding that a jury must determine whether information was publicly available or a protected trade secret); *see also* Docs. 181-41 at 2 of 6 (NDA definition of "Proprietary Information"); 181-3 of 3 (DRS officer agreeing that pricing data sent by Advantor was proprietary).

23

Finally, regarding the NDA claim, it cannot be reasonably disputed that DRS used Advantor's information when it copied Advantor's performance data into its SPAWAR proposal almost verbatim—and the Government relied on this specific data when deciding to award the contract to DRS.

Although DRS still tries to avoid liability, claiming that Advantor did not properly alert it to the confidentiality of this information, the record shows that DRS knew that the information was sent in reliance on the NDA protections. *See* Doc. 111 (Whirley Dep. at 184–92, 196–200). Further, it is undisputed that the email sending the information had a confidentiality notice on its face. Like the district court, DRS wants to discount this notice on the ground that it was "boilerplate." But the NDA notice provision does not bar the use of "boilerplate" confidentiality language. In adopting DRS' position on this issue, the district court effectively rewrote the NDA notice provision, which it had no power to do. Given this record, it is for a jury to determine if there was a violation of the NDA.

## IV.  CONCLUSION

DRS accuses Advantor of "conducting an *ad hominem* attack on the District Judge, accusing him of bias." DRS Br. at 22. Advantor did no such thing. It simply quoted the transcript, which speaks for itself. In any event, a *de novo* review of the record shows that the district court did err. The judgment in DRS' favor must be reversed, therefore, and the case remanded for trial on all counts.

24

Respectfully submitted this April 4, 2016.

/s/ Laurie Webb Daniel
Laurie Webb Daniel
HOLLAND & KNIGHT LLP
One Atlantic Center, Suite 2000
1201 West Peachtree Street, N.E.
Atlanta, Georgia 30309-3400
(404) 817-8500
laurie.daniel@hklaw.com

Min K. Cho
Florida Bar No. 754331
HOLLAND & KNIGHT LLP
200 S. Orange Ave., Suite 2600
Orlando, FL 32801
(407) 425-8500
min.cho@hklaw.com

Brandon H. Elledge (*pro hac vice*)
HOLLAND & KNIGHT LLP
1600 Tysons Blvd., Suite 700
Tysons Corner, VA 22102
(703) 720-8015
brandon.elledge@hklaw.com

*Attorneys for Plaintiff-Appellant*
*Advantor Systems Corporation*

## STATEMENT OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6009 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 14 point font.

/s/ Laurie Webb Daniel
Laurie Webb Daniel
HOLLAND & KNIGHT LLP
One Atlantic Center, Suite 2000
1201 West Peachtree Street, N.E.
Atlanta, Georgia 30309-3400
(404) 817-8533
laurie.daniel@hklaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2016, I filed a copy of the foregoing brief with the Clerk of Court using the Appellate CM/ECF system and served copies of such filings via e-mail, with copies by first-class mail to follow, on the following attorneys of record who represent Appellee/Defendant DRS Technical Services, Inc.:

Nicole A. Sbert
Jackson Lewis, PC
Suite 1285
390 N Orange Ave
Orlando, FL 32801
(407) 246-8440
sbertn@jacksonlewis.com

Stephanie Leigh Adler-Paindiris
Jackson Lewis, PC
Suite 1285
390 N Orange Ave
Orlando, FL 32801
(407) 246-8440
adlers@jacksonlewis.com

/s/ Laurie Webb Daniel
Laurie Webb Daniel
HOLLAND & KNIGHT LLP
One Atlantic Center, Suite 2000
1201 West Peachtree Street, N.E.
Atlanta, Georgia 30309-3400
(404) 817-8533
laurie.daniel@hklaw.com